## Staunton.

### A. H. JACOBY COMPANY *v.* WILLIAMS.

September 9, 1909.

1. MASTER AND SERVANT—*Place of Danger—Voluntary Act of Servant.* A servant of mature years who volunteers to go to a particular place of danger on the occasion of his injury cannot complain that he was sent out of his regular employment into a place of danger.

2. MASTER AND SERVANT—*Methods of Work—Presumption.*—In the absence of evidence to the contrary, it will be presumed that the methods of work adopted by a master are proper and sufficient.

3. MASTER AND SERVANT—*Assumption of Risk—Notice of Dangers.* The rule which requires the master to inform his servant of the dangers ordinarily incident to the service, and if he fails to do so and the servant has no opportunity to learn them, the servant will not be held to have assumed the risks not obvious to one of his age, experience and judgment, only applies where there is a danger known, or which ought to be known, to the master, of which the servant, on account of his youth or inexperience, is ignorant, and which he cannot reasonably be expected to discover by the exercise of ordinary care.

4. MASTER AND SERVANT—*Notice of Dangers—Obvious Dangers—Presumption.*—A master is under no obligation to warn an adult servant of sound mind of the existence of dangers that are visible to any man of ordinary intelligence, though not an expert, and which he could not fail to see and comprehend. The master has the right to assume, in the absence of evidence to the contrary, that such a servant has ordinary intelligence and capacity, and is possessed of the instinct of self-preservation.

5. MASTER AND SERVANT—*Safe Place—Changing Conditions—Making Place Safe.*—The general rule that a master must use ordinary care to provide his servant a reasonably safe place in which to work does not apply to a place which is constantly changing by reason of the work being done, nor where the very work the servant is employed to do consists in making a dangerous place safe.

6. Master and Servant—*Happening of Accident—Presumption—Negligence.*—Negligence of the master resulting in injury to his servant cannot be inferred from the mere occurrence of an accident. The presumption is that the master has discharged all of his legal duties to his servant, and this presumption can only be overcome by affirmative proof. In order to hold a defendant liable for a negligent injury, there must be affirmative and pre-ponderating proof of the defendant's negligence.

7. Negligence—*Proximate Cause—Requisites.*—The requisites of prox-imate cause are the doing or omitting to do an act which a person of ordinary prudence could foresee might naturally and probably produce the injury by such act or omission, and the in-fliction of the injury by such act or omission.

Error to a judgment of the Circuit Court of Scott county in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Joseph L. Kelly,* for the plaintiff in error.

*Coleman & Carter,* for the defendant in error.

Cardwell, J., delivered the opinion of the court.

This action was brought by defendant in error to recover of plaintiff in error damages for injuries to the plaintiff alleged to have been caused by the negligence of the defendant.

At this, a second trial of the case (the jury failing to agree at the first trial), upon all the evidence offered being submitted to the jury, the defendant demurred thereto, in which demurrer the plaintiff joined; and the jury having assessed damages to the plaintiff in the sum of $3,000, subject to the ruling of the court upon the demurrer to the evidence, the court overruled the de-murrer and entered judgment in accordance with the verdict.

The following are the facts and circumstances attending the accident out of which the suit arose: Williams (defendant in

error and plaintiff below), about 29 years of age, was engaged to work as a common laborer for plaintiff in error (defendant below) upon and about a certain railroad grade which defendant was constructing along the side of a steep and rocky hill which runs up some distance from Clinch river, and to construct this railroad bed or grade it was necessary to blast and tear down a portion of the cliff above it. The roadbed or grade at that point had been started for a single track, and had been carried through or along the side of the cliff for some distance when it was determined to widen the grade for a double track. The upper side or "slope" of the cut through the face of the hill had been blasted off and thrown down once, and another thickness at the time of the accident to Williams was being taken off along the upper side—i. e., more of the cliff had to be and was being torn down, and the method of doing this was to drill deep holes on the upper side of the cut, sinking these holes down from a point several feet back from the top of the slope. After the holes had been drilled they were first "sprung" by charges of dynamite placed and shot in the bottom, the purpose of which was to enlarge and open the hole so as to admit a heavy charge of powder with which to blow off the material between the hole and the face of the slope. These holes having been "sprung," the usual and perfectly natural effect was to shake, jar and "shiver" the side of the slope and to cause more or less rock, etc., to fall down. All such material, as well as what was blown off by the heavier shots, either rolled on down the hill towards the river or was lodged on the grade and thrown over on the lower side, or loaded in carts and hauled back on the "dump" or fill, which was a part of the grade extending back from the point at which the cut began; and the slope of the cut all along above the grade through the cliff presented a rough and dangerous appearance, a condition apparent to anyone with ordinary vision, as its discovery did not depend upon expert knowledge, or any experience or skill other than that which a man of ordinary intelligence would possess. According to Wil-

liams' own statement, his duties were to "pick and shovel and carry steel and things like that," and he had also carried dynamite from the powderhouse to the cut where the "shooting" was being done.    There is a variance in the evidence as to how long he had been at work at the point of this accident to him, but he admits that he had been working there six or seven days, and that he had a short time before worked, perhaps two weeks, in a borrow-pit for the Carolina Company, engaged in the construction of this same roadbed along this same hill, doing the same general class and character of work which the defendant, the A. H. Jacoby Company, was doing at the time of the accident, the latter company having taken up the work where the Carolina Company left off.

Williams was working with a gang of men engaged in and about the cut when the accident to him happened, the chief work being tearing down the face of the slope to widen the roadbed, and they were changing the condition of the slope to that end and for that purpose as fast as they could, and the dangers of the situation were all the time apparent.

Just preceding the accident some holes had been drilled up on top of the slope, Williams himself having been up there to carry steel with which to drill them.    Upon returning to the cut below, he and others were engaged in loading carts, and while they were so engaged a signal was given from the top of the cut that one of the holes was to be "sprung"—i. e., a "shot" was to be let off.    Immediately after the "shot" was let off Williams, with others, who had moved back up in the cut became engaged in loading a cart with rock that had been "shot" down from above.    That the rocks all along the slope of the cut were "shivered" and looked dangerous after this "shot" cannot be doubted, although Williams undertook to say in his testimony that "he could not see it," but admitted that he did not know whether he looked and tried to see or not.    In a few minutes one Hensley, who was the foreman (under the walking boss) of the immediate gang at work at this cut, and who had been up

on top and near the holes that had been drilled, one at least of which had been "sprung," came down where Williams and others were at work and said that he needed some dynamite and other material (which, as affirmatively appears, was needed to break up some some big stone that had fallen or loosened from the "springing" of the hole in question), and called up one Monroe, a member of the gang, telling him to go to the commissary and powderhouse for it, and Monroe was "fixing to start" when Williams said, "I can go," or "I will go," or something to that effect, adding in substance that he was out of tobacco and wanted to get some; whereupon Hensley remarked that he did not care who went. Williams does not admit or deny the statement about the tobacco (which is not at all material), and there is no conflict as to the fact that Hensley first called on Monroe, and that Williams volunteered to go.

After Williams had volunteered to go, Hensley handed him a written order to the commissary clerk, designating the explosives, etc., which were wanted, and (according to a witness who was back on the dump or fill some distance away, and did not hear what Williams had said to Hensley) told Williams "to hurry, they were needing the dynamite right away." Williams having volunteered to go, in giving the instruction "to hurry," Hensley gave him no instructions as to the route he should travel, and Williams had in mind no other route than the one he started out on, although there were two other routes entirely safe that he might have taken, both of which he knew of, but had never used them, as he preferred the short way that he had been going on other trips to the commissary.

The path Williams took passed under the lower side of the grade where the men were at work and led right through the rock and waste that had from time to time been blasted and thrown down, or had rolled down from the cut and cliff or the roadbed above; the path being under the point at which the hole had been "sprung," and only about 25 or 30 feet below the railroad grade. The path was rough and steep, but was not

itself dangerous; the danger being, as Williams unquestionably knew, or with his experience and intelligence should have known, not in the condition of the path, but in the results of the work carried on above it, and the condition of the slope from the grade or roadbed to the point above where the blasting had to be and was being done. When Williams had gone about 30 or 40 feet on this path, and was 25 or 30 feet below the grade of the railroad bed, at a point approximately opposite to the place where he had just been at work, a large rock that had been "shivered" (i. e., loosened by the "springing" of the hole, as mentioned), broke away from the slope of the cut and rolled down over the roadbed, burst, and a piece of it struck Williams and broke his leg, which subsequently had to be amputated.

The negligence of the defendant alleged is: (1) Unsafety of the place where the plaintiff was required to work; (2) non-inspection; (3) failure to warn as to the danger attending the work being done; and along with the alleged breach of these several duties the charge is repeated that the defendant sent the plaintiff out of his regular employment into dangers that were not incident thereto.

With respect to the charge that the plaintiff was sent out of his regular employment into danger, all that need be said is that he alleges in his declaration, and so testifies, that it was a part of his duty to make trips to the commissary for material; and aside from his having volunteered to go on the occasion of this accident to him, and having no legal cause of complaint (*Echels* v. *N. & W. Ry. Co.,* 96 Va. 69, 25 S. E. 545), he has failed, as we shall see, to prove actionable negligence on the part of the defendant.

The proof is absolutely conclusive that the rock, a piece of which struck Williams, was not broken or loosened up on top of the slope of the cut, but on the side thereof, and no witness states that the plaintiff could not from where he was see the place from which the rock actually fell, but several say that he could.

Again, it is to be observed that whatever danger there was consisted, not in the condition of the path on which Williams was when injured, but in the work carried on above it, and the condition of the slope from the pathway to where the blast was made, due to the natural conditions existing there, and the changing and shifting conditions constantly arising in the prosecution of the work, and as to which Williams was as well informed as anyone else engaged in the work.

Whether the defendant's method of doing the work was the necessary and usual method is not raised by the pleadings nor dealt with in the evidence, and in the absence of evidence to the contrary it will be presumed that the methods of work adopted by a master are proper and sufficient.  26 Cyc. 1413; *Moore Lime Co.* v. *Johnson,* 103 Va. 88, 48 S. E. 577.  There is no allegation of inexperience in the declaration, nor is inexperience proven.  The plaintiff was of mature years—29 years old—and there was no attempt to show that he ever informed the defendant or its foreman, or that they knew, or ought to have known, of his inexperience, if such was a fact.  He is to be presumed to be a man of ordinary intelligence, and have known that when the side of the slope under which he was engaged to work was shaken, jarred and "shivered" by blasts necessary to be made on the top of the slope, the materials thereby loosened were liable to fall down upon him and others below.  *Robinson* v. *Dininny,* 96 Va. 43, 30 S. E. 442.

The rule that it is the master's duty to inform his servant of dangers ordinarily incident to the service, and if he fails to do so and the servant has no opportunity to learn of them, the servant will not be held to have assumed the risk not obvious to one of his age, experience and judgment, "only applies where there is a danger known, or which ought to be known, to the master, of which the servant, on account of his youth or inexperience, is ignorant, and which he cannot reasonably be expected to discover by the exercise of ordinary care." *Richmond Locomotive Works* v. *Ford,* 94 Va. 640, 27 S. E. 509; *Partlett*

v. *Dunn,* 102 Va. 464, 46 S. E. 467; *Bollington* v. *L. & N. R. Co.,* 125 Ky. 186, 100 S. W. 850, 8 L. R. A. (N. S.) 1045; *Carriack* v. *Merchants W. Co.,* 151 Mass. 152, 23 N. E. 829, 21 Am. St. Rep. 438, 6 L. R. A. 735; Bailey on M. L., 112.

"In case of an adult servant of sound mind, the rule is understood to be that where the dangers of the employment are visible so that any man of ordinary intelligence, though not an expert, could not fail to see and comprehend them, an employer is under no legal obligation to warn the servant of their existence." 4 Thompson on Neg., sec. 4061. See also notes to sec. 394, 1 Labatt on M. & S.

In *Jones* v. *Mfg. & Inv. Co.,* 92 Me. 565, 32 Atl. 512, 69 Am. St. Rep. 539, the opinion says: "In *Stuart* v. *West End Street Ry. Co.,* 163 Mass. 391, 40 N. E. 180, a young man of twenty was set at work feeding hay into a hay cutter, though that was not his regular work. No warning or instruction was given him as to the danger. Held, that the danger was so obvious that he must be presumed to have understood it. The court said: 'Where the elements of the danger are obvious to a person of average intelligence using due care, it would be unreasonable to require an employer to warn his employee to avoid dangers which ordinary prudence ought to make him avoid without warning. The mere fact that he cannot tell the exact degree of the danger, if the nature and character of it can easily be seen, is not enough to require warning and instruction to a man of full age and average intelligence. Something may properly be left to the instinct of self-preservation and to the exercise of the ordinary faculties which every man should use when his safety is known to be involved.

" 'The master may assume that an adult person has ordinary intelligence and capacity, and unless he has notice to the contrary, he is under no obligation to instruct or warn such a servant as to dangers which the ordinary servant would understand and appreciate.' 2 Cooley on Torts (3d edition), p. 1132."

Unquestionably where a servant is employed to engage in a dangerous work, such as excavation, quarrying and the like, the master, as a general rule, owes him the duty to use ordinary and reasonable care and diligence to make his place of work as reasonably safe as the nature of the work admits of, but this general rule does not apply to a place which is constantly changing by reason of the work done. 26 Cyc., p. 1117, *et seq.* See also *Finlayson* v. *Utica M. & M. Co.* (C. C. A.), 67 Fed. Rep. 510, where the rule is fully discussed, and it was held that the rule cannot be justly applied to cases in which the very work the servants are employed to do consists in making a dangerous place safe, or in constantly changing the character of the place for safety as the work progresses. "The duty of the master does not extend to keeping such a place safe at every moment of time as the work progresses. The servant assumes the ordinary risks and dangers of his employment that are known to him, and those that might be known to him by the exercise of ordinary care and foresight. . . ." See also *Heald, Receiver,* v. *Wallace,* 109 Tenn. 347, 21 S. W. 80; *Russell Creek C. Co.* v. *Wells,* 96 Va. 416, 31 S. E. 614; *N. & W. Ry. Co.* v. *Coffey,* 104 Va. 671, 51 S. E. 729, 52 S. E. 367; *Black* v. *Portland C. Co.,* 106 Va. 121, 55 S. E. 587.

In the last two mentioned cases relied on by the plaintiff in this, the recovery was sustained, but the doctrine laid down in the other authorities above cited was expressly recognized, and in the first named of these two cases it is emphasized that "the unsafe condition was not attributable to the work which was being conducted in the quarry"; and in the other, the opinion, after showing that the danger was not open or obvious or discoverable by the plaintiff, in the exercise of ordinary care for his own safety, says: "Nor can it be maintained that the dangerous condition of the place at which Black was put to work and where he met his death was due to the changing and shifting conditions of the quarry brought about in operating it."

This doctrine is reviewed in 2 Labatt, secs. 587 and 588,

where, in conclusion, the learned author says: "It should be observed that in some cases of this class the element of the fellow servant's negligence is not involved at all, and recovery is denied on the broad ground that there is no breach of duty on the master's part."

To the contention that Hensley knew of the "perils" which Williams would encounter, and the "dangers incident to travelers along the dug-out way" he was traveling when injured, and that Williams was without experience, a complete answer is that the evidence not only does not show that Williams was inexperienced (in fact, it was not alleged), but conclusively shows that Williams was permitted to go at his own request, and that he as well knew, or ought to have known by the exercise of ordinary care, of any "perils" or "dangers incident" to the route he himself chose, as did Hensley, and, therefore, Williams on no legal ground could complain of the failure of Hensley to warn him of these "perils" and incidental dangers.

The alleged neglect to inspect seems to refer only to the pathway on which the plaintiff, Williams, was struck by the falling rock, and there is no evidence whatever tending to show that such an inspection would have disclosed the danger of rocks falling upon the pathway likely to injure persons passing thereon, or that inspection in such a case was usual or necessary.

In all cases of the class to which this belongs it is held that negligence on the part of the employer cannot be inferred from the mere occurrence of an accident by which his servant is injured; the presumption being that the master has discharged all of his legal duties to his servant, and this presumption can only be overcome by affirmative proof. *Moore L. Co.* v. *Johnson, supra,* and cases there cited; *Va. I. C. & C. Co.* v. *Kiser,* 105 Va. 705, 54 S. E. 889.

In this case the work was essentially dangerous, and the place was, therefore, not safe; but there is nothing to show that the place was less safe than the work in hand made unavoidable, and, besides the presumption that Williams was acquainted

with the dangers of the work, his own testimony shows that he did, as a matter of fact, understand the method and the purpose and effect of "springing" the holes, and comprehended the dan-' ger caused thereby to persons working in the cut below, or had full opportunity to do so.   He had before carried steel to the men who drilled the holes, and had on the day of his injury carried up on the slope the steel which he knew was to be used to drill and "spring" holes under which he was to work.   In truth, his testimony disclosed that he was quite familiar with the entire method of doing the work; that when a blast was made, as on the day of his injury, rock was liable to fall, and had looked at the slope "lots of times to see if there was danger."   There was everything in the situation to warn him of the dangers, and to inform him that the best point from which to observe the effect of the "springing" of the holes at the top of the slope was from below, where he was and where he usually worked; that one man could see this as well as another; and that no one, whatever were his duties in connection with the work being done, could tell certainly whether a particular rock or rocks were liable to fall upon the roadbed or the pathway below and injure someone, without climbing upon the face of the cliff and prizing at them, which would be attended with imminent danger to the one going on such a mission.

As already observed, all engaged at work in and about this cut along the side of a cliff knew and well understood, or could have known and so understood by the exercise of ordinary care for their own safety, the dangers attending the work, and that those dangers to a greater or less degree increased as the shifting conditions were brought about by the progress of the work; so that inspection was neither necessary nor usual, and would not, under the circumstances existing when Williams was injured, have afforded him any better protection against danger than the precautions that he could and should himself have taken.

"In order to hold a defendant liable for a negligent injury there must be affirmative and preponderating proof of the de-

fendant's negligence." *Clinchfield Coal Co.* v. *Wheeler,* 108 Va. 448, 2 Va. App. 369, 62 S. E. 269; *So. Ry. Co.* v. *Moore,* 108 Va. 338, 64 S. E. 747, 2 Va. App. 325; *N. & W. Ry. Co.* v. *McDonald's Admr.,* 106 Va. 207, 55 S. E. 554, and *Same* v. *Witt, post,* p. 117, 65 S. E. 489.

The requisites of proximate cause are the doing or omitting to do an act which a person of ordinary prudence could foresee might naturally and probably produce the injury by such act or omission, and the infliction of the injury by such act or omission. *Wilson* v. *Southern Ry. Co.,* 108 Va. 822, 62 S. E. 972, 2 Va. App. 645.

Viewing the evidence in this case in the light of the established principles of law adverted to, we are of opinion that actionable negligence on the part of the defendant has not been established; therefore the judgment of the circuit court must be reversed, the demurrer to the evidence sustained, and judgment entered by this court for the plaintiff in error, the defendant below.

*Reversed.*