Staunton.

# W. B. ADDINGTON, ADMINISTRATOR ETC., V. GUESTS RIVER COAL COMPANY.

## September 22, 1921.

1. DEMURRER TO THE EVIDENCE—*Conflicting Evidence—Time.*—In an action for the death of a miner, defendant demurred to the evidence. Plaintiff insisted that a statement of the superintendent of the mine was in conflict with the testimony of another witness, and therefore a jury would have been justified in rejecting all that witness' testimony. The statements of the witnesses referred to time and were flexible estimates.

   *Held:* That a jury dealing with the statements of the witnesses in question would not have been justified in concluding that they were in necessary opposition, and unless they were in such opposition, credence is to be given to both witnesses.

2. DEMURRER TO THE EVIDENCE—*General Rule.*—If upon demurrer to the evidence, the evidence is such that the jury might have found a verdict for demurree, the court must so find, and give judgment in his favor, and further, if reasonably fair-minded men might differ upon a question, such a question must be decided against demurrant.

3. MASTER AND SERVANT—*Duty of Servant to Provide for His Own Safety.*—A servant must provide for his own safety from such dangers as are known to him, or which are discernible by ordinary care on his part, and this duty is as obligatory upon him as the duty of the master is upon the master to provide for him.

4. MASTER AND SERVANT—*Duty of Master to Warn Servant.*—The rule that it is the master's duty to inform his servant of dangers ordinarily incident to the service, only applies where there is a danger known, or which ought to be known, to the master, of which the servant, on account of his youth or inexperience, is ignorant, and which he cannot reasonably be expected to discover by the exercise of ordinary care.

5. MASTER AND SERVANT—*Safe Place to Work—Changing Conditions.*—Unquestionably, where a servant is employed to engage in a dangerous work, the master, as a general rule, owes him the duty to use ordinary and reasonable care and diligence to

make his place of work as reasonably safe as the nature of the work admits of, but this general rule does not apply when the work which the servant is employed to do consists in constantly changing the character of the place for safety, as the work progresses.

6. MASTER AND SERVANT—*Warning—Obvious Danger.*—Where the dangers of the employment are visible, so that any man of ordinary intelligence, though not an expert, could not fail to see and comprehend them, an employer is under no obligation to warn the servant of their existence.

7. MASTER AND SERVANT—*Assumption of Risk—General Rule.*—A servant, when he enters the service of the master, assumes all the ordinary risks of such service, and also, as a general rule, assumes all risks from causes which are known to him, or should be readily discernible by a person of his age or capacity, in the exercise of ordinary care.

8. MASTER AND SERVANT—*Contributory Negligence—General Rule.*—A plaintiff seeking recovery for injuries on the ground of negligence of the master, and alleging such negligence as the proximate cause of said injuries, must not be guilty of negligence that either solely causes, or proximately contributes to, the injuries complained of.

9. NEGLIGENCE—*Definition.*—Negligence is the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation; or doing what such a person would not have done, under the existing circumstances. The duty is dictated and measured by the exigencies of the situation.

10. MINES AND MINERALS—*Master and Servant—Miner Killed by Falling Rock—Case at Bar.*—In the instant case, plaintiff's decedent, a miner, was killed by falling draw-slate. The danger of falling draw-slate is an open and obvious one to a man accustomed to work in mines, as decedent was. Decedent saw the crack between the sandstone and the rock that ultimately fell, and his attention was particularly called to the meaning of this crack, and the specific warning that it conveyed. His fellow-laborer, mindful of danger to his own life, refused to go under this rock, and decedent had other warnings of the danger of the situation. The necessary prop to support this rock was furnished, and ready to hand, and it was decedent's duty to set this prop, and the prop, once set, would have supported the rock.

*Held:* That ordinary prudence and natural good sense brought to bear upon such a situation imperatively indicate that the miner should have removed, or propped, the rock or withdrawn

74

himself from danger, and therefore decedent was guilty of negligence and plaintiff could not recover.

11. MASTER AND SERVANT—*Mines and Minerals—Assumption of Risk—Case at Bar.*—In the instant case, plaintiff's decedent, killed by falling draw-slate in a. mine, had told his father that he was afraid he could not keep up the props, and, when asked by his father to quit, replied that he would try it a little longer. *Held:* With respect to the general danger of falling draw-slate, decedent assumed the risk.

Error to a judgment of the Circuit Court of Wise county in an action of trespass on the case. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Fulton & Vicars,* for the plaintiff in error.

*Bullitt & Chalkley,* for the defendant in error.

SAUNDERS, J., delivered the opinion of the court.

This is an action to recover damages for personal injuries to the plaintiff in error's intestate.

The defendant company demurred to the evidence, and the jury rendered a verdict for the plaintiff subject to this demurrer. This demurrer was sustained by the court, and judgment entered for the defendant. Thereupon the plaintiff applied for and secured a writ of error from one of the judges of this court. The action of the trial court sustaining the demurrer to the evidence is assigned as error.

The defendant was the owner and operator of a coal mine near Tacoma, in Wise county, Virginia. Some time during the year 1918, John M. Sparks (plaintiff's intestate) applied for and secured work as a miner in this mine, his particular assignment being to dig and load coal. While en-

gaged in this work, in August, 1918, a large piece of rock, called draw-slate, fell upon Sparks, inflicting injuries causing his death.

This draw-slate is an intervening rock stratum in the roof or ceiling of a coal mine lying between the coal and the sandstone top. The thickness of this stratum varies in different mines. The quality of this draw-slate also varies. In some mines it is rotten and friable, in others it is tough. The slate in this particular mine was blue slate, "tough slate," as it is described by one of the witnesses. This overhanging slate stratum is liable to fall from the ceiling when the support of the underlying coal is removed. Hence, as the work of removal proceeds, the draw-slate must be supported by wooden props. Loose, or cracking slate, carries its own indication of danger, and affords a warning that its possible fall must be provided against by suitable props.

Hinton, a colored man who was hauling, or "pulling coal," for Sparks at the time he was injured, testifies that when he returned to the room, after taking out a car, he found intestate under the rock which had fallen during his absence. This rock the witness describes as "nine or ten feet long, or probably longer."

The defendant stated the following grounds of demurrer, which will be considered in connection with the evidence.

I. The evidence fails to show that the defendant was guilty of any negligence which was the proximate cause of the injury complained of.

II. The evidence shows that the plaintiff's decedent, John M. Sparks, was guilty of negligence, and that such negligence was the sole cause of, or contributed to, the injury complained of.

III. The evidence shows that the plaintiff's decedent had knowledge of the danger complained of, and assumed the risk thereof.

IV. The evidence shows that the injury complained of resulted from danger ordinarily incident to mining, and from a danger which was open and obvious, and therefore one which the plaintiff's decedent in accepting the employment, and remaining in the employment, assumed.

V. The evidence shows that the injury complained of happened in the working place of plaintiff's decedent, at the face of the coal, and further shows that it was the duty of plaintiff's decedent to protect himself against such dangers in his working place.

VI. The evidence shows that plaintiff's decedent violated the law of the Commonwealth of Virginia, after discovering the danger overhead in his working place from loose slate, in not staying from under said slate, in the roof of said mine in his working place, until after he had propped same, or otherwise made same safe.

VII. The evidence shows that plaintiff's decedent was reasonably experienced in mines, and in coal mining and loading; that he knew of, and had been warned of, the danger of loose draw-slate hanging overhead, in the roof of his working place where he was working; shows that he had at hand sufficient props with which to protect himself against danger from such loose slate; shows that there was no compulsion upon him to remain under such loose slate in his working place, and shows that it was his duty either to protect and prop such loose slate in his working place, or else to remain from under same, and that, nevertheless, he continued to work thereunder, assuming the risk of such danger, and that as a result of such negligence, and such contributory negligence on his part, he received the injury complained of, from the falling of such loose slate from the roof in his working place.

One of the allegations of the declaration is that the decedent was not an experienced miner, and that his knowl-

edge and understanding of mining was not such as to enable him to know, understand, or appreciate, the very great dangers that surrounded him on account of the dangerous condition of the roof of the room in which he was at work.

This allegation raises an issue of fact, and testimony is not lacking to establish the extent of the decedent's intelligence and experience, and the sufficiency of both to enable him to apprehend that a cracked stratum of slate in no wise attached to the upper sandstone would be likely to fall when the support of the underlying coal was removed.

T. L. Flanary, a witness who had been mining coal "off and on for something like eighteen years," testifies in part as follows:

### *Examination in Chief.*

"Q. Did you know John M. Sparks?

"A. I had known him ever since he was a kid.

"Q. Do you know whether he was an experienced miner, or not?

"A. I would not think John was an experienced coal miner from what I know about him.

"Q. Knowing him as you do, and having seen the place, and judging from your experience, would you, as a mine superintendent, or foreman, have put him in this place to work?

"A. Knowing what I do about John's coal digging. He came to me while I was foreman on Whiteoak, two or three times, for a job. I had bad top, and did not give him any work. I did not think he was a man who could run a place safe, and did not give him any work to do.

"Q. Would you have given him work in this place by himself?

"A. No, sir, he nor any other man I knew as well as I knew him.

"Q. Do you know the character of that roof there where he was killed generally, whether it was good or bad?

"A. Well, I never done any work in this mine that John was killed in, but it was the same seam of coal that Camper worked and Bruce worked at Greeno, and it is all bad top."

It will be noted that this witness does not state when decedent came to him for a job, or how much experience as a miner decedent had acquired after that time, nor does he testify as to any association with him as a miner, or any opportunities that he had had to form a personal judgment from association and observation. His statement as to the character of the top in Guests River Company's mine is based upon observation of top elsewhere in other mines on the same seam of coal.

*Cross-Examination.*

"Q. You had known of him doing work in the mines, for how many years back before he was killed?

"A. I never worked in the mines with John, but I had heard him talking about working in the mines a right smart bit.

"Q. Running back over a period of several years?

"A. Yes, sir.

"Q. You had never worked with him?

"A. I do not remember that I ever worked a day with him in the mines. I knew of him doing work; he had told me and others would tell me that he was working in the mines at Greeno, backhandling for some fellows down there, but I never worked any with him.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. About how old was Mr. Sparks?

"A. Well I would guess John must have been about 35."

## A. G. P. CORDER.

*Cross-Examination.*

"Q. How long have you known John Sparks?

"A. I have known him well since 1903, when I moved to Tacoma.

"Q. This happened in 1918?

"A. Yes, sir.

"Q. About fifteen years?

"A. Yes known him well—I have known him off and on all, my life.

"Q. What did he do during that time that you knew him?

"A. Well, I reckon he worked around the mines, the most of the time.

"Q. He had been a miner ever since you have known him this fifteen years?

"A. Well, I believe that I have known him working around Greeno mines; about 1904, he was working there.

"Q. Do you know what he was doing there?

"A. No, sir, he was working around the mines   *   *   *

"Q. You lived close to him and knew that he worked in the mines during that time?

"A. Yes, sir.

"Q. Was he a man of reasonable intelligence?

"A. Yes, sir.

"Q. A man of pretty fair intelligence?

"A. Yes, sir.

"Q. Knowing him as you did, if you had had work for him in the mines you were running, would you have hesitated to employ him to work in the mines?

"A. No, sir, I don't know that I would.

"Q. Do you know of any reason why you should not have done so?

"A. No, sir; I don't know that I would object to his working.

"Q. You thought that he was a man of reasonable experience?

"A. Yes, I guess so. * * *

*Re-Examination.*

"Q. You never observed Mr. Sparks working in the mines yourself?

"A. No, sir, I don't know anything about his work in the mines. I don't really know much about that, only he worked around the mines. I never was in the mines where he was at work, as I remember of.

"Q. And never observed him in the manner of his work, and you could not positively say whether you would have felt that you were doing right to put him to work by himself, or not?

"A. Well, I suppose if he had come and wanted to work, I would have let him work. Of course, as I say, I am not an experienced miner myself. I do not think that I would have hesitated to let him work."

## A. J. SEXTON.

"Q. What experience have you had mining?

"A. I have had forty years, went into the mines when I was eleven years old.

* * * * * * * * * *

"Q. In pillar work as a mine superintendent, would you put a man to work by himself, or would you require some one with him?

"A. I would not put a man to work by himself, unless he was an experienced hand.

"Q. Did you know John Sparks?

"A. Yes, I have known him ever since he was a little boy.

"Q. Did you regard him as an experienced miner?

"A. No, sir, I did not.

"Q. Did you regard him sufficiently experienced to work without some experienced hand with him?

"A. No, sir, I did not.

"Q. Would you, or not, have put him to work there?

"A. No, sir, not in a place like that by himself.

*Cross-Examination.*

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"Q. How much has John Sparks ever worked in the mines with you?

"A. He never worked but two days to the best of my recollection. First work he ever done, I hired him to back-hand for me at Greeno. He worked two days, and little pieces of slate commenced falling, and he said I ain't going to work here, I will get killed, and I told him it would not hurt him, I would watch the top, but he says, 'No, I won't do it.'

"Q. How long ago was that?

"A. About ten years ago.

"Q. There were the only two days you ever worked him in the mines?

"A. Yes, sir.

"Q. You never saw him work in the mines any since that?

"A. No, sir, but I knew of his working. I knew of his whereabouts.

"Q. You knew he was working?

"A. Yes, sir, he worked outside a good deal?

"Q. You know he has worked in the mines since that?

"A. I know that he worked some few days at a time, off and on.

"Q. Do you know the month or so he worked at Greeno was all the work he ever done?

"A. He worked at Mr. Weeks a while, that was all I ever heard of him.

"Q. If he ever worked any more, you do not know it?

"A. No, sir.

"Q. If he just worked with you two days ten years ago, how do you say that he was not an experienced miner?

"A. Well, I knew his whereabouts all the time, and would say he has not been in the mines over a year since that.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"Q. You haven't the slightest idea of how much experience he has acquired since twenty years ago?

"A. I don't believe he has worked in the mines over a year.

"Q. You do not know how well he did his work?

"A. No, sir.

"Q. Or how much he learned?

"A. No, sir.

"Q. Or how much he had opportunity to learn?

"A. No, sir.

"Q. Isn't the top in the Greeno mines and the Weeks mines about the same?

"A. No, sir, the Weeks mine (*i. e.,* the mine in which the decedent was working) has fairly good top for that seam of coal.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"Q. Was Mr. Sparks a regular sort of worker?

"A. Sometimes he would work, sometimes take a notion to lay off a week.  \*  \*  \*  \*

"Q. He was one of those men who worked now and then?

"A. Yes, he worked a week or two, he was a man who liked to be out in the woods and hunt.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"Q. He was a man of pretty good sense?

"A. Yes, he was a man of pretty good sense.

"Q. Good, sound horse sense?

"A. Yes, good sense.

"Q. He was not a fool, or idiot, or anything of that sort?

"A. No fool by any means, plenty of sense.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Q. I say in slate you can tell pretty well (*i. e.* test it readily)?

"A. Yes, you can tell about slate.

"Q. When you have draw-slate and there is a crack between it and the sandstone top that you can put your finger in, what does that indicate?

"A. It is pretty loose.

"Q. Is it dangerous?

"A. Yes, if it is not propped.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Q. What kind of slate was this?

"A. Blue slate, tough slate.

"Q. Would that indicate it was coming down?

"A. If it was cracked, and drawed down, I would consider it dangerous.

"Q. What would be a man's duty to do?

"A. Duty to take it down, if he could see it was dangerous.

"Q. If he could see a crack in there, what was it his duty to do?

"A. It was his duty to prop it, or take it down.

"Q. *It was his duty to prop it, or take it down as a miner?* (Italics supplied.)

"A. Yes, or get out from under it.

"Q. You would not say that John Sparks was not a man of enough intelligence, if he saw a place like that, cracked and drawn down, to prop it, or take it down, or get out from under it?

"A. It was like myself. I have worked under a top like that, see it that way and work on.

"Q. But you knew you were taking a risk?

"A. Yes, I took the risk.

"Q. And you knew you were taking a risk, and if it fell on you that was the end of it?

"A. Yes, I have worked under it, still I would think it would hang there. I have worked in places, and the foreman would come in and say, don't you know that top there is bad, and I says yes, and he says prop it, and I would say, I will prop it directly, and he says you will prop it now, or you will quit, and I would prop it, or he would prop it himself. Some places the miner sets the timbers, and some places the company sets them.

"Q. It was the miner's duty there at this place to set the timbers?

"A. *Yes, they set the timbers,* the straight timbers. (Italics supplied).

"Q. A straight timber back of the car was all that was needed there?

"A. Yes, sir.

"Q. And you would work on, and load the car, finish the car, or finish the day?

"A. Yes, sir.

"Q. But you knew you were doing it at your risk?

"A. Yes, I have done that many times.

"Q. Yet you knew you ought to get out?

"A. Yes, I ought to got out.

"Q. Did you do that during the first twenty years, or after that?

"A. It was after I learned something about the top.

"Q. That was after you knew something about mining?

"A. Yes, sir, the first eight or ten years I kept the timbers up close, and then I thought I knew all about it, and then—

"Q. You got careless. You were a good, careful miner, until you got to be an experienced miner?

"A. Yes, sir.

"Q. And after you got to be an experienced miner, you became a careless miner?

"A. Yes, that is what causes men to get killed most of the time.

"Q. That was what happens the most of the time?

"A. Yes, sir.

*Re-Examination.*

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*

"Q. I believe you told Mr. Chalkley that if these two props had been set, and one back in the roadway, the rock could not have fallen?

"A. If the one had been set back in the roadway, I do not think the work would have fell.

"Q. Wasn't one set there?

"A. No, sir."

The testimony of this witness has been extracted freely, because it contains a substantial proportion of the plaintiff's case. Most of the features relied upon to support the verdict are found therein, and the citations from other witnesses are mainly corroborative.

The father of the decedent states that his son did not understand mining very well, but could make more money by taking a place, and digging by himself—that he didn't think that he had worked as much as a year and a half in the coal mines—that when the weather was bad, he would work in the coal mines a while. On cross-examination he made the following statements in part:

### Cross-Examination.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

."Q. You knew that your son had been working there in the place by himself for some little while?

"A. Yes, a while, a few weeks maybe. I would go out when he would pass in front of my door, and ask him if he did not think it was dangerous, and he said it was.

"Q. But he was making good money?

"A. Yes, sir, he said he was. \*   \*   \*

"Q. You knew then he was working by himself?

"A. Yes, sir.

"Q. He told you he was?

"A. Yes, sir, he said he was afraid he could not keep the props up, and I asked him several times to quit, and he said he would try it a little longer."

The defendants took the testimony of one witness, a colored man named Hinton, who was hauling coal for decedent. His testimony affords an intimate account of the circumstances immediately preceding the fatal accident.

### WILLIAM HINTON.

### Examination-in-Chief.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"Q. How long before he was hurt was it that you were in his room?

"A. I guess twelve or fifteen minutes..

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"Q. Did you notice his roof, or anything about the condition of his room at that time?

"A. Yes, sir.

"Q. What was the condition of the slate where he was working and over and immediately behind the car that he had there?

"A. Well, he had a rock up over the car that had given down, I guess near half an inch.

"Q. What do you mean by rock?

"A. Draw-slate.

"Q. How big a piece?

"A. I don't exactly know, but it was a big one; I guess nine or ten feet long, probably longer.

"Q. State whether you regarded that rock, or draw-slate, dangerous the way it was hanging up in the roof?

"A. Yes, when I went up there the time before I went up there, I was scared of the rock. I would not go under it, told him I would pull at the front, and he could push at the other end of the car, if he wanted to, that I would not go under that rock. He said that he did not think there was very much danger in it, he would get out another car that day, and probably it would come down in the night.

"Q. Did he see the rock you were talking about?

"A. Yes, sir.

"Q. How close were you to it?

"A. Three feet.

"Q. How close was he?

"A. Under it.

"Q. You refused to go under it, to go to the back end of the car and push it out?

"A. Yes, sir.

"Q. Did he have any talk there about the rock at that time?

"A. No, sir, he didn't say anything more about it, any more than I only had three timbers there at that time, no, four timbers, and I went and got another one, me and the mine boss (Taylor). We had carried him one that day, and I went and got and carried him another.

"Q. What sort of prop?

"A. We got a four and a half foot prop.

"Q. How many props had you hauled earlier?

"A. I had hauled him one, and we carried him up one, and I took him one by myself, and then I got the bank boss, and we carried him another one.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. Why did you use shorter props in the roadway?

"A. Generally set them on top of the ties.

"Q. Did you carry him a short prop that day?

"A. Yes, one four foot prop.

"Q. Why?

"A. He asked me to bring him a timber.

"Q. Mr. Sparks?

"A. Yes, after I spoke to him about the rock. He said he wanted a four foot timber.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. About how long had Mr. Sparks been working there?

"A. About three months, I suppose, as far as I remember, all the time I was there.

### Cross-Examination.

"Q. You say you regarded the rock that fell as dangerous?

"A. Yes.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. What was exactly what you said to Sparks?

"A. Why when I went in after the car, I saw the rock had given down; he said let's push it out, and I says 'No, that rock up there is going to fall.' He says, 'Oh, ain't no danger in that rock,' and he went to push behind, and I says: 'I wouldn't go back there, we can pull it here.'

"Q. Sparks said there was no danger in the rock?

"A. Yes, sir.

"Q. I thought you said a while ago he thought it would fall that night?

"A. He did.

"Q. He thought it was going to fall that night, it would not be dangerous then, would not fall then?

"A. Yes, sir."

There is a good deal of evidence to the effect that the place where Sparks was working was not, as a whole, properly timbered. But conceding this to be true as to the rest of the room, it is unimportant in this connection. The rock that killed decedent was one immediately over the car that he was loading. It is shown that the erection of a single prop would have prevented the fall of the rock.

## FLANARY.

"To the best of my recollection, the piece of slate went back over the rear of the car, I guess five feet. If a jack prop had been set at the rear of the car under the slate, the slate would have been safe at the present time."

## SEXTON.

"Q. If there had been a timber set there (*i. e.* at the car), would it have held the rock?

"A. Yes.

"Q. Good mining would have required a timber to have been set there?

"A. Yes, sir.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. But a prop set behind the car would have held it? (*i. e.*, the rock that finally fell)?

"A. Yes."

Further, it was the duty of the miner to set the props where he was working.

"Q. It was the miner's duty at this place (*i. e.,* defendant's mine) to set the timbers?

"A. Yes, they set the timbers, the straight timbers.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. If he (i. e., Sparks) could see a crack in there, what was it his duty to do?

"A. It was his duty to prop it, or take it down."

The evidence establishes that the necessary props were afforded decedent, and while one or two of them were too short to reach from the floor to the roof, it is shown that these short timbers were intended to be set upon the ties. When this was done they were long enough.

The witness Hinton testifies that before the rock fell, he carried the decedent a short prop at the latter's request.

The evidence of plaintiff's witnesses as to the extent of decedent's experience is conflicting, but the aggregate of that experience was considerable, certainly sufficient to enable him to know the danger of draw-slate.

One of the witnesses for the plaintiff (Corder) testifies that he had known decedent off and on all his life, and when asked what he did during "all that time that he knew him," replied that he "reckoned he worked around the mines the most of the time." Other witnesses limit his aggregate time of actual work in the coal mines during his life period to a year, or a year and a half.

Decedent is described as "No fool by any means, plenty of sense, good sense."

[1] A part of plaintiff's case is a statement made after the fatal injury by Weeks, the superintendent of the mine. This statement was made in the presence of several witnesses, and, in the language of one of them, is as follows: "Mr. Weeks said there was a piece of rock fell while he was in there—I don't remember whether he said it was a small

piece of rock, I believe he said a small piece of rock fell—he said the rock give down until he could about put his finger over it, and he said to John—he said he warned John; said to John we must watch, or notice, these little things. He said to John, we must watch, or notice these little things."

This warning was ten or fifteen minutes before the rock fell. Weeks' statement is proven by several witnesses, and the forms in which it is repeated are variant, but substantially the same. For instance, another witness, Corder, states that Weeks said, "that he was in John's place a few minutes or a little while before he was killed, and noticed the rock had given down, so that he could put his finger over the rock, and he said to John 'you will have to watch these little things.' "

Plaintiff in error insists that Weeks' statement and the testimony of Hinton are conflicting, and, therefore, the jury would be justified in rejecting all of Hinton's testimony. This conflict is supposed to be found in that portion of Hinton's testimony in which he says that, "he was in decedent's room he guessed twelve or fifteen minutes before he was hurt," and that "Mr. Weeks was not up in his (*i. e.,* Sparks') room, he was coming down from up in the heading."

This statement of Hinton's is not in necessary conflict with the statement imputed to Weeks. The latter was with Sparks "a few minutes before he was killed," or "a little while before he was killed," or "ten or fifteen minutes before he was killed," or "about fifteen minutes before he was killed" using the language of the witnesses who repeat Weeks' statement. Hinton guessed that he was in Sparks' room twelve or fifteen minutes before his death.

These statements of time are flexible estimates, that can be no more given a precise and definite interpretation than

the word "several," as ordinarily used. But even as made, one party might readily have been with Sparks shortly before his death, and left before the other arrived. Hinton was pulling coal for Sparks and regularly coming and going. He was undoubtedly in the latter's room at various times in the course of the day, and his statement that when last there he did not see Weeks, does not cast doubt upon his assertion that he saw decedent in his room twelve or fifteen minutes before his death. A jury dealing with these statements of Weeks and Hinton would not be justified in concluding that they were in necessary opposition, and unless they were in such opposition, credence is to be given to both witnesses. The alleged contradiction between the respective statements furnishes no ground upon which this court, under accepted rules, should reject the entire testimony of Hinton.

[2] The rule of consideration on demurrer to the evidence is succinctly stated in *Milton* v. *N & W. Ry. Co.*, 108 Va. 763, 62 S. E. 961: "If upon demurrer to the evidence, the evidence is such that the jury might have found a verdict for demurree, the court must so find, and give judgment in his favor, and further, if reasonably fair-minded men might differ upon a question, such a question must be decided against demurrant." The evidence in the instant case and the effect of same will be considered in the light of these as well as of other principles of recognized authority, now to be cited.

[3] "A servant must provide for his own safety from such dangers as are known to him, or which are discernible by ordinary care on his part, and this duty is as obligatory upon him as the duty of the master is upon the master to provide for him." *Va. Iron, Coal & Coke Co.* v. *Munsey*, 110 Va. 163-4, 65 S. E. 479, 481.

[4] "The rule that it is the master's duty to inform his servant of dangers ordinarily incident to the service, * * *

only applies where there is a danger known, or which ought to be known, to the master, of which the servant, on account of his youth or inexperience, is ignorant, and which he cannot reasonably be expected to discover by the exercise of ordinary care." *Jacoby Co.* v. *Williams,* 110 Va. 61, 65 S. E. 493.

[5] "Unquestionably where a servant is employed to engage in a dangerous work * * * the master as a general rule owes him the duty to use ordinary and reasonable care and diligence to make his place of work as reasonably safe as the nature of the work admits of, but this general rule does not apply when the work which the servant is employed to do consists in constantly changing the character of the place for safety, as the work progresses." *Jacoby* v. *Williams, supra,* 110 Va. p. 63, 65 S. E. 494.

"Where the dangers of the employment are visible, so that any man of ordinary intelligence, though not an expert, could not fail to see and comprehend them, an employer is under no obligation to warn the servant of their existence." *Id.* 110 Va. p. 62, 65 S. E. 493.

There is also the rule of assumed risk.

[7] "A servant when he enters the service of the master assumes all the ordinary risks of such service, and also as a general rule, assumes all risks from causes which are known to him, or should be readily discernible by a person of his age, or capacity, in the exercise of ordinary care." *Clinchfield Coal Co.* v. *Wheeler,* 111 Va. 265, 68 S. E. 1001.

In the case of *Crane's Nest Coal & Coke Co.* v. *Mace,* 105 Va. 624, 54 S. E. 479, it appears that the miner in order to make more runs, that is, a larger daily output, failed, before undercutting, to test the overhanging coal which had been improperly left in position by other employees. The miner knew that the coal might fall, and could have made a test by tapping this coal with a pick. When the coal bulged,

it was the duty of the undercutter to report the fact to the foreman, and stay out of danger until the coal was properly faced. The plaintiff said that he knew it was dangerous to cut under bulging coal, but thought it was solid, and did not think that it was his duty to test it before cutting. The court held in that case that the plaintiff was confronted with an open and obvious danger, which he could and should have avoided, and that the facts showed an assumption of risk on his part, which precluded recovery. *Crane's Nest Coal & Coke Co.* v. *Mace,* 105 Va. 624, 54 S. E. 479.

In *Mason & Perkins* v. *Post,* 105 Va. 500, 54 S. E. 313, 11 L. R. A. (N. S.) 1038, the court said that when the plaintiff entered the service of the defendants, he assumed "not only the usual ordinary risks and perils of the service, but also such other risks as became apparent by ordinary observation." His performance was optional, and he took the chance of such perils.

A ruling case in Virginia on the subject of perils obvious to a man of ordinary intelligence, is that of *Fields* v. *Virginian Ry. Co.,* 114 Va. 558, 77 S. E. 501. In that case, the method of doing the particular work in progress was to cut into the bottom of an embankment under and along the front, and then make a trench along the top of the embankment, parallel with the face of the same. This work completed, the next step was to break off the front of the embankment which had been cut under, by the use of crowbars. While the trench was being cut, and the holes bored, preliminary to prizing off the face of the embankment, the face gave way, carrying down the foreman and an employee who was helping him. A laborer who was at work on the embankment at this time, engaged in undercutting, was injured. Said the court, in passing on his claim for damages: "The injured party was of mature years, and ordinary capacity and intelligence. He knew how the work was being done, and that there was some

risk in that manner of construction. The risk was open and obvious, and incident to the work as it was being done." A verdict for the railway company was sustained.

Generally speaking, it is the duty of the servant to provide for his own safety from such dangers as are known to him, or are discernible by ordinary care on his part, and this duty is as obligatory on him as the duty of the master is upon the master to provide for him.

[8] A plaintiff seeking recovery for injuries on the ground of negligence of the master, and alleging such negligence as the proximate cause of said injuries, must not be guilty of negligence that either solely causes, or proximately contributes to, the injuries complained of.

[9] Negligence has been authoritatively defined as follows: "Negligence is the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation; or doing what such a person would not have done, under the existing circumstances. The duty is dictated and measured by the exigencies of the situation." *B. & P. Ry Co.* v. *Jones*, 95 U. S. 442, 24 L. Ed. 506.

[10, 11] Decedent was a man thirty-five years old, in complete possession of his faculties, and naturally endowed with "plenty of sense," "good sense." The witnesses do not seem to think that he was an "experienced miner," though they do not advise us in any clear and definite fashion as to what is necessary to constitute such a miner. However, one of these witnesses, a miner, "guessed he (*i. e.,* Sparks) was a man of reasonable experience," and speaking for himself said that "he didn't know that he would have hesitated to let him work," if he "had come and wanted to work." At any rate, decedent had secured the experience that would come from working off and on about coal mines for a large portion of his life. In the aggregate he had done much actual work, and at the time of his death he was working in a place

where, as his work progressed he constantly changed the character of the place for safety. The danger to be apprehended was an open and obvious one and the perception of this danger called for no acute powers of observation. When a man first enters a mine, and observes props in position, the necessity and purpose of their use is obvious. Decedent had not only observed these props in position during many years of actual observation which had acquainted him with their use, but at the time he received his fatal injuries was engaged in work in which it was his duty, as that work progressed, to place his own props, and thereby assure his own safety. (See statement of Sexton, *supra.*) His obligation in that respect was definitely imposed, and he had been supplied with the props necessary to support the very rock that ultimately fell and killed him. When he called for a prop of specified length, that prop was promptly furnished and was in his room at the time of his death.

As touching on decedent's knowledge of the danger ever present when a miner is working under partially detached, or rotten, roof, it will be recalled that the witness Sexton states that over ten years ago, when Sparks was working for him in a coal mine, little pieces of slate commenced to fall. At once decedent said: "I ain't going to work here, I will get killed." In response to Sexton's suggestion that "it would not hurt him, that he (Sexton) would watch the top," decedent replied: "No, I won't do it." It is possible that as decedent increased in experience, and acquired greater knowledge of top, he took greater chances, but this would not furnish ground for a recovery. According to Sexton, after he (*i. e.,* Sexton) "got to be an experienced miner, he became a careless miner," and would work under "cracked and drawn down" top, observing it all the while, and knowing that it was his duty to prop it, or take it down, or get out from under it, but not doing any one of these things, simply "taking the risk."

Sparks' father states that his son told him that he was afraid he could not keep up the props, and when he asked him several times to quit, he replied that he would try it a little while longer. This was certainly an assumption of risk, since he was under no compulsion to continue to work.

Decedent's co-laborer, the witness Hinton, noticed the draw-slate shortly before it fell, and called Sparks' attention to the fact that it had given down "near half an inch." He was "scared of the rock," and "refused to go under it," telling Sparks that "he could push at the other end of the car, if he wanted to," but that "he would not go under that rock." If Hinton was an experienced miner, this suggestion on his part was certainly a warning to be regarded; if he was not an experienced miner, his perception of danger should not have been more acute than that of decedent. Hence, what was obvious to him should have been obvious to Sparks. In response to Hinton's warning of danger, and expression of personal apprehension, decedent responded "that he did not think there was very much danger in it (i. e., the rock), that he would get out another car that day, and probably it would come down in the night."

In addition to the warning of danger conveyed by the condition of the roof, and the freely expressed alarm of Hinton over the threatening aspect of the piece of draw-slate immediately over the decedent's car, it appears that Weeks, the superintendent of the mine, was in decedent's room shortly before his death, and noticing that the rock in question had given down to such an extent that he could put his fingers in the crack, warned him that this was a portent of danger, saying that these little things must be watched. Having in mind that the danger of falling draw-slate is an open and obvious one to a man accustomed to work in mines—that decedent saw the crack between the sandstone and the rock that ultimately fell—that his attention was particularly called to the meaning of this crack,

and the specific warning that it conveyed—that his fellow laborer, mindful of danger to his own life, refused to go under this rock—that the necessary prop to support this rock was furnished, and ready to hand—that it was the duty of the miner to set this prop—that this prop once set would have supported the rock, what was the duty of a reasonable and prudent person under the circumstances; what would such a person have done?

If negligence is doing what a reasonable and prudent person would not have done under the circumstances, then in the situation reviewed the decedent was guilty of negligence.

Ordinary prudence and natural good sense brought to bear upon such a situation, imperatively indicate that the miner should have removed, or propped, the rock, or withdrawn himself from danger. It may be that the superintendent did not think that the rock would fall at once, it may be that decedent concurred in that view, but he did think that it was likely that it would fall that night. With that thought in mind, he took the risk of its falling sooner, and of the danger to his life when he continued to work under a loose and unpropped slab of draw-slate. He cannot be relieved from the charge of contributory negligence proximately contributing to his death. If the warning of Weeks might have been more emphatic than it was, still there was nothing in what he said to create a situation in which the miner's continuance in his work was at the risk of the company. With respect to the general danger of falling draw-slate, the miner in the instant case assumed the risk.

Plaintiff in error cites us to the cases of *Ridley* v. *Clinchfield Coal Corporation*, 119 Va. 711, 89 S. E. 926, and *Va. I., C. & C. Co.* v. *Munsey, supra,* in support of plaintiff's right to recover. The facts of these cases are very different from the facts of the case in judgment. In *Ridley's*

*Case,* the master assured the servant that if he would act as brakeman for a reckless motorman, the latter would operate the motor slowly during the period of their joint service. The court held that under this assurance, notwithstanding the brakeman's antecedent knowledge of the recklessness of the motorman, he did not assume the risk of the injury that resulted therefrom, as a matter of law. It was further held by the court that the brakeman had the right to rely upon the company's assurance that if he worked with the motorman, "the motorman would operate the motor slowly." Hence, his subsequent association with the motorman was at the company's risk.

In Munsey's Case, the miner abandoned the room where he was working because he considered it dangerous. He did not return to work until the mine boss assured him that the room had been made safe. This miner was inexperienced, and positively stated that he did not understand the danger of working in his room on his return. Moreover, in this case it was the duty of the company to prop the rock that ultimately fell on the plaintiff. Held: That under the circumstances the miner did not assume the risk.

After a careful review of the facts of this case, and of the authorities cited, we find no error in the action of the trial court sustaining the demurrer to the evidence, and its judgment is affirmed.

*Affirmed.*