# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## FARMER'S ADMINISTRATRIX v. CHESAPEAKE AND OHIO RAILWAY COMPANY.

### January 14, 1926.

1. NEGLIGENCE—*Proximate Cause—Conditions as They Were at the Time of the Injury.*—In seeking the proximate cause of an injury, we must look to conditions as they were at the time of the injury, not to conditions as they might have been under different circumstances, nor to conditions as they ought to have been if every one had discharged the duties imposed upon him by law.

2. MASTER AND SERVANT—*Proximate Cause—Death of Car Repairer from Burning by Mahrvel Torch—Case at Bar.*—In the instant case plaintiff's intestate, an expert mechanic, came to his death through burns from a Mahrvel torch, which he was operating. In order to repair the hose which attached the torch to the oil tank, plaintiff's intestate detached the hose, cut off both ends and reattached it to the tank and the torch. Either plaintiff's intestate failed to make the proper connections when he attached the hose to the tank, or he failed to cut off enough of the hose. The detachment of the hose from the tank set in motion the force which, in natural and continuous sequence without any intervening cause, directly produced the injury complained of, and hence was the efficient or proximate cause thereof.

3. PROXIMATE AND REMOTE CAUSE—*Definition—Incidental Causes.*—The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation. The causes that are merely incidental, or instruments of a superior or controlling agency, are not the proximate causes and the responsive ones, though they may be nearer in time to the result. It is only when the causes are independent of each other that the nearest is, of course, to be charged with the disaster.

4. MASTER AND SERVANT—*Safe Tools and Utensils—Liability of Master.*—As a general rule, it is the duty of the master to use ordinary care to furnish his servants with tools and utensils that are reasonably safe for the use to which they are to be applied. But he is not an insurer of the safety of the servant, and is liable for the consequences of negligence, not of danger.

5. MASTER AND SERVANT—*Safe Tools and Utensils—Liability of Master— Exceptions—Construction or Repair of an Instrumentality.*—The general

3

rule as to the master's duty to furnish safe tools is subject to the exception that where the very work the servant is employed to do involves the construction or repair of an instrumentality for the use of himself or others, and he knows or ought to know the dangers involved, and the proper method of construction or repair, the master is not liable for an injury to the servant resulting from his improper construction or repair.

6. Master and Servant—*Death of Car Repairer from Mahrvel Torch—Duty of Master to Inspect and Keep in Repair Tools—Exercise of Servant's Judgment—Case at Bar.*—In the instant case plaintiff's intestate, an expert mechanic, came to his death through burns from a Mahrvel torch, which he was operating. In order to repair the hose which attached the torch to the oil tank, plaintiff's intestate detached the hose, cut off both ends and reattached it to the tank and the torch. Plaintiff insisted that defendant was negligent for failing to inspect and keep in repair the rubber hose. Decedent's employment as car repairer involved the use of the torch. In the first instance, he was furnished a perfectly safe and sound hose, but the ends were liable to be damaged in use by dragging the torch around. It was manifest that decedent knew or was instructed how to remedy the defect.

*Held:* That in repairing the hose decedent exercised his own judgment for which defendant was not liable, nor did defendant's failure to inspect the hose render it liable.

7. Master and Servant—*Inspection—Car Repairer Killed by Mahrvel Torch—Defects which would not have been Disclosed by Inspection—Case at Bar.*—Unless the injury complained of resulted from some defect, imperfection or other cause which would have been disclosed by proper inspection, the failure to inspect would not be actionable negligence. In the instant case, action for the death of a car repairer from burns by a Mahrvel torch, the main body of the hose which attached the torch to the oil tank was clearly shown to be in sound condition, and defendant was not obliged to use extraordinary and unusual tests to discover latent defects, where a much simpler test was available.

8. Master and Servant—*Death of Car Repairer from Burns from a Mahrvel Torch—Suggestions by Fellow Servant as to Getting New Torch which Were Never Communicated to Decedent—Case at Bar.*—In the instant case plaintiff's intestate was killed by burns from a Mahrvel torch, which he was operating. A fellow servant who was working with decedent testified that just before the accident he suggested to decedent getting a new hose from the foreman but that decedent did not act on the suggestion, and then he suggested to the foreman that they ought to have a new hose and that the foreman replied that they might have some over at the roundhouse and "we could go and get one."

*Held:* That the suggestion to the foreman and his reply had no sig-

nificance because they were never communicated to decedent and were made while the torch was burning and so immediately before the accident that they could not have been acted on by decedent even if he had been informed of them and desired to act on them.

9. MASTER AND SERVANT—*Death of Car Repairer from Burns from a Mahrvel Torch—Liability of Master—Case at Bar.*—In the instant case plaintiff's intestate was burned to death when the connection of a Mahrvel torch with the oil tank, which he was operating, was blown off. The use of the torch was within the line of the employment of plaintiff's decedent as car repairer. He was familiar with its use and was entrusted with so cutting off the ends of the hose as to make it safe for his use. He was competent to make this necessary repair and if in consequence of his own acts injury and death resulted to him, his master cannot be held liable.

10. MASTER AND SERVANT—*Death of Car Repairer from Burns from a Mahrvel Torch—Questions of Whether Connection was Properly Made—Physical Fact—Case at Bar.*—In the instant case, an action for the death of a car repairer from burns received when the connection of the hose of a Mahrvel torch with the oil tank blew out, the connection was made by the car repairer and there was much controversy as to whether it was properly made. Plaintiff's testimony was to the effect that the connection was properly made, but this testimony for the plaintiff was contradicted by the undisputed physical facts, which must prevail.

11. DEMURRER TO THE EVIDENCE—*Parol Evidence not in Conflict with that of the Demurree.*—The demurrant does not give up his parol evidence which is not in conflict with that of the demurre. He may supply gaps and fill in deficiencies in the evidence of the demurre, and show other independent affirmative facts, provided only they do not conflict, directly or indirectly, with the evidence demurred to.

12. DEMURRER TO THE EVIDENCE—*Inferences that May be Drawn by Court.*— In drawing inferences favorable to the demurre, the court can draw only such inferences as a jury might have *fairly* drawn from the evidence. The court is not bound to draw inferences that are strained, forced, or contrary to reason.

13. MASTER AND SERVANT—*Inspection—Where Inspection would not have Prevented the Injury—Case at Bar.*—Noninspection can only impose liability where inspection would have prevented injury. In the instant case, an action for the death of a car repairer from burns from a Mahrvel torch, inspection of the automatic valve, immediately after the accident, while it was in an unaltered condition, showed that the valve was in perfect order and it was proven that its failure to work at the time of the accident was probably due to some trash getting temporarily under it, and, therefore, it did not appear that prior inspection would have prevented the injury.

14. MASTER AND SERVANT—*Instructions to Servants—Car Repairer Using*

*Mahrvel Torch—Case at Bar.*—In the instant case, an action for the death of a car repairer from burns received while operating a Mahrvel torch, it was alleged as negligence that defendant failed to instruct decedent as to the safe way to operate the oil tank and torch. No instructions are needed to a servant who knows and is capable of fully appreciating the danger to which he is exposed. Decedent was a skilled mechanic and had over two years' experience as a car repairer. He had been using this identical torch for eight or nine months—ten or twelve times at the least. Decedent knew as much about the danger to which he was exposed as the master could tell him and had been given safety-first instructions.

*Held:* That the master could not be charged with negligence as to instructions.

15. Master and Servant—*Instructing Servant—Ordinary and Visible Danger—Skilled Mechanic—Case at Bar.*—The master is not under obligations to warn an adult servant of sound mind of the existence of dangers that are visible to men of ordinary intelligence, and has the right to assume, in the absence of evidence to the contrary, that his servant has ordinary intelligence and capacity and is possessed with the instinct of self preservation. This is particularly applicable to the case of a skilled mechanic with years of experience who has been injured by a piece of machinery which he had been employed to operate.

16. Appeal and Error—*Action for Death of Car Repairer—Section 1625 of the Constitution of 1902 and Section 5791 of the Code of 1919.*—In an action for the death of a car repairer from burns received while operating a Mahrvel torch, while repairing a car, it was not material to decide whether or in what manner section 5791 of the Code of 1919 and section 162 of the Constitution of 1902, affect the case where the conclusion would be the same in either event.

17. Master and Servant—*Assumption of Risk—Section 162 of the Constitution of 1902.*—The common law doctrine of assumption of risk was not totally abolished by section 162 of the Constitution. It was abolished only to the extent therein specified.

18. Master and Servant—*Railroads—Assumption of Risk—Ordinary and Usual Risks.*—When a servant enters the service of a railroad company he assumes all of the ordinary and usual risks incidental to the service, except those abolished by section 162 of the Constitution of 1902 and section 5791 of the Code of 1919, including the risks incident to the manner in which he knew, or, in the exercise of ordinary care, ought to have known, the defendant conducted its business, if it appears that the master's method was a reasonably safe one.

19. Master and Servant—*Constitution of 1902, Section 162—Application to Repairs.*—Constitution of Virginia, 1902, section 162, did not apply to a servant employed for the purpose of rendering safe an unsafe appliance. The provision was intended to meet the ordinary common

law doctrine of assumption of risk in the cases specified, and not the extraordinary case of a skilled workman, with full knowledge of all the risks, undertaking to make safe a defective appliance.

20. MASTER AND SERVANT—*Railroad Employee—Section 1294k of the Code of 1904.*—Section 1294k of the Code of 1904, as amended, was repealed by the Code of 1919.

21. MASTER AND SERVANT—*Railroad Employee—Section 1294k of the Code of 1904—Power of General Assembly to Repeal.*—The State Constitution is a restraining instrument only, and, except so far as restrained by the State or Federal Constitution, the legislative powers of the General Assembly are unlimited. The general rule that the power to enact is a power to repeal applied to section 1294k of the Code of 1904. Section 1294k was a mere legislative enactment, subject to repeal as other acts of Assembly. It was no part of the Constitution and the legislature had no power to make it so. If rights were conferred by it on railroad employees that did not exist prior to its enactment, those rights were taken away by its repeal in cases thereafter arising.

Error to a judgment of the Law and Equity Court of the city of Richmond, in a proceeding by motion for a judgment for damages. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

This is an action to recover damages for the death of the plaintiff's intestate, alleged to have resulted from the negligence of the defendant. After all the evidence had been submitted, the defendant demurred to it, and the jury assessed the damages at $10,000 subject to the opinion of the court upon the demurrer to the evidence. The trial court sustained the demurrer to the evidence and dismissed the action; and the case is here on a writ of error awarded to that judgment.

As said by the trial judge, this is "a very appealing case," and as we feel compelled to affirm the judgment of the trial court, the preliminary statement of facts is taken almost entirely from the plaintiff's statement of the case in the petition for the writ of error, and for

the most part using the language of the petition, but making some few omissions, some few additions, and correcting a few inaccuracies, but omitting quotation marks where the exact language is used. We do this to insure the plaintiff against the omission of any evidence claimed by her to entitle her to a judgment.

E. S. Farmer, a young man 31 years of age, was burned to death May 9, 1923, leaving a widow and five infant children, ranging in age from eight years to eight months. He was employed by the Chesapeake and Ohio Railway Company about August 7, 1922, and in his written application for employment he states that he had previous experience of a year and a half. At the foot of the application is the following certificate: "I certify that I have given safety first instructions to this applicant." Signed, "G. H. Taylor, foreman."

On the above mentioned day he was working for the Chesapeake and Ohio Railway Company, at its Fulton yards, immediately east of the city of Richmond, and there were two others, T. B. Baber and C. B. Rock, with him, engaged in repairing a fifty ton steel coal car. The said car had a dent in it which it was necessary to remove. This could not be done except by heating up the place on the car to such an extent as to cause the steel to soften so that the dent could be hammered out. In order to apply the necessary heat, Farmer, Barber and Rock were furnished with what is called a Mahr or Mahrvel torch. The torch, when in operation, is attached to a steel tank, containing fuel oil and compressed air, which passes in two lines of rubber hose between ten and fifteen feet in length from the tank to the torch, where the oil and compressed air is forced out of the nozzle of the torch through a needle valve in a powerful stream of fine spray. When a light is

applied to the nozzle of the torch, this explosive spray instantly bursts into an intensely hot flame. From the testimony on behalf of the defendant company it appears that the only safe way to operate this dangerous instrumentality was, before lighting it up, to turn the connections away from the man holding the torch. These precautions were absolutely necessary because the man holding the torch had no control at the tank and could only control the flow of the oil at the torch. The distance between the tank and the torch was, as stated, from ten to fifteen feet. The operator at the torch had his back to the tank.

The men began work about eight o'clock in the morning. They were only told to remove the dent from the steel coal car. The manufacturers of the torch also provided it with a "*shut off valve*" for automatically stopping the flow of oil in case of a split pipe, broken fitting or burst or cut hose carrying oil under pressure. Of this device the defendant company had full knowledge. No instructions were given to either Baber or Rock, as to how the work could be safely done, nor was any evidence offered to show that the "shut off" valve was ever inspected until after the fatal accident. The fifty ton steel car from which the dent was to be removed was standing on a track of the defendant company in Fulton yards, and Baber and the deceased were directed to remove the dent by the foreman of the company, Mr. Moody, and he instructed them as to what work was to be done on said car. The witness, Rock, testified that the "end sill" of the car "was in bad shape and bent kind of under the car where the coupler had shoved it under * * and we got to the car to look on and so we looked at it, and Mr. Moody, our foreman, came along. He had already inspected the car before, wrote upon

the car what he wanted done with it. He came along. I told him it was in right bad shape and it was going to require right much work to get it out there, * * so he said all right to go ahead; * * so, when we have any steel like this, heavy and all, that we have to straighten out, we have been getting this torch, this blower, and bring it (the steel) to a red heat and jack it (the dent) out, or get it out with some kind of puller, or something to pull it out in proper place. So we went up to get this tank, as we usually did for other jobs * * ."

The tank and torch were procured and the air pressure put on the tank preparatory to the operation of the torch, when it was discovered that the rubber oil line connecting tank and torch was leaking up near the tank, and also near the torch.

C. B. Rock further testified: "After we discovered the oil coming out of the hose, he (Farmer) said he reckoned he would have to fix it; would have to cut out the bad part. * * So he took it loose and cut off about three feet or so, I guess it was, the part that seemed to have been bad. It was long and had been dragging on the ground; holes had come in it.

E. B. Moss, a witness for the defendant, who was assistant master mechanic at its Fulton yards, testified as follows: "When a hose begins to leak, except it leaks about two or three feet from the torch, either on the torch or reservoir end, we usually take them out of service, * * You can take any * * kind of hose * * and where they are connected * * the movement is so much more acute than it is at any distance from it, it causes the fibre to break in there; you *generally cut the end off of them and use the bodies up,* but if there is any place in the middle of the hose that develops a hole * * our instructions are to take the hose out of service."

In accordance with this practice, Farmer, Baber and Rock took the oil hose off the tank and torch, cut off the ends of the hose at both ends and reattached the body of the hose.

Baber and Rock testified that the connection and adjustment were carefully and correctly made.

The hose is composed of rubber fabric, a light canvas. The rubber is not porous, and therefore is a good conveyor, but some mechanical reinforcement of it is necessary. The outside is rubber and the inside lining is also rubber about one-eighth of an inch thick. When the hose is new, the rubber both inside and out of the fabric, is elastic and resilent.

There is on the tank a nipple, to be used in attaching the rubber hose, and in making this connection a union nut and a split ring or collar are also employed. The nipple is about one and a half inches in length, beginning at a shoulder, slightly decreasing in diameter until nearly at its end, where it becomes slightly larger or ball-like. The union nut is of brass, about one and a half inches in length, the inside diameter of which varies, and one end of its inside surface is threaded. The split ring or collar is also brass, and is about one-half or three-fourths of an inch in width and one-fourth of an inch thick. Its outer edges are beveled, but its inside diameter is the same, and that surface smooth. In making the connection, the end of the hose is passed, first, through the union nut, then the split ring or collar and then the hose is pushed over the nipple and its end forced flush against the shoulder of the nipple. After this, the split ring is pushed over the hose and nipple until it is up against the shoulder, following which the union nut is brought up over all, and its threaded inner surface engaged with the threaded surface of the shoulder of the nipple. The union nut

is then tightened with a wrench. As this nut is tightened the inside surface of the nut comes in contact with the split ring, on the edge away from the shoulder. This part of the inside surface of the union nut is also beveled, but opposite to the way the opposing end of the split ring is beveled, so that the effect of the pressure of the nut on the split ring is to constrict the split ring around the hose, drawing ring and hose up closer to the shoulder of the nipple. The diameter of the nipple becomes gradually larger toward the shoulder and the hose is thus compressed tighter and tighter about the nipple and shoulder, until the nut is made secure.

The split ring and end of the hose are entirely hidden from view when the connection is completed.

Baber and Rock testified that when they and the deceased were making the connection they first measured the length of the nipple, then measured an equal distance on the hose, and marked the distance off with a chark mark on the outside of the hose. They then put the hose on the nipple, and pushed it up so that the end of the hose was close up against the shoulder. Baber testified that he felt the hose at the chalk mark and could feel the end of the nipple right at the mark. Then the split ring was brought up close to the shoulder of the nipple, over the hose; next the union nut was brought up over the hose and the split ring, the threads of the nut engaged in those on the shoulder of the nipple, and the nut made fast and tight by drawing it up with a pipe wrench. Baber also testified that after the connection was made fast he bent the hose down and could still see that the chalk mark was on the outside of the hose at the nipple's end, and he was satisfied the end of the hose was right up against the shoulder.

They further testified that both the connection at

the tank and the torch were made in the same careful manner, except that in making the connection at the torch, the hose was not marked as it was at the tank, but that connection remained fast; and we are not here concerned with it.

After the connections were put on, and the torch ignited, Farmer directed the flame against the "end sill" of the car they were repairing.

When Farmer started operating the torch, he was standing between the tank and the end of the car which he was heating up. *The connections on the tank were pointed toward Farmer.*

While the work was going on, Mr. Moody, the foreman in charge of the particular gang, came up and stood near the torch warming himself. He was told about the hose, and though he stood there a few minutes, gave no directions and offered no suggestions other than to state, in reply to a question from Rock, that there might be new hose in the round house, and they might go and get one. Moody left the scene of this work and within a few moments the oil hose blew off the nipple, throwing a spray of oil over Farmer, which became at once ignited and burned him so severely that he died that day.

Rock testified that he had his back turned when the flash first occurred, and turning just in time to see Farmer "dive" between the car he was working on and the row of cars on the track next to this one. Rock saw but little because of so much flame and smoke. He observed the broken connection and that oil was shooting out about twelve or fifteen feet on Farmer and endangering not only the lives of the workmen around about, but certain wooden box cars near by. Rock thereupon hastened to the tank and cut off the oil and the air.

All of the witnesses testified that the hose was "blown off" the connection, and that the spurt or spray of oil from the nipple at the tank enveloped Farmer, igniting and burning him to death. He died at the hospital that day, May 9, 1923.

The testimony is that the air pressure was produced nearly a mile away from the scene of the accident, at the defendant's roundhouse. This compressed air was piped to various places throughout the roundhouse and yards. The only control the deceased had over the pressure and flow of oil and air was that he could cut it off at the torch—not at the tank which was ten or fifteen feet away from him.

The tank was equipped with what was known as an "automatic safety shut off valve" at the point where the oil leaves the tank to enter the oil line leading to the torch. Mr. Moss testified that it was a "simple" device, which consisted of a steel ball which rested on a bolt in a cylindrical chamber slightly larger than the ball, held in position by gravity. Under normal conditions the ball would remain seated. "That ball, as long as the pressure is equalized around it, will permit the oil to come out around it, but when you cut the hose in two, you increase the pressure on the bottom side and decrease it on the top side, because instead of restricting the flow of the oil, you open it up to the elements; that reduces the pressure on the top of the ball and the pressure at the bottom closes it up." That is, the ball is forced up to the top of the cylindrical chamber, where the diameter is narrower, and thus the flow of oil is shut off. At the time of the accident this valve did not work when the hose carrying the oil was blown off. Moss testified that the only way in which this device was ever inspected to determine whether or not it was in order, was to take off the valve

and see whether or not it was clean, and this was done every thirty days. He also testified that he inspected the valve after the accident and that it appeared to be all right; that there was no foreign substance in it to clog it. He did not test it by cutting the oil line to see whether or not the ball would move up as intended, and shut off the spurt of oil.

The defendant's witness, Moss, further testified: "No device, no matter how much the manufacturers claim it is absolutely safe, is absolutely safe, consequently *our instructions were to turn the nozzles away from the operators*, so that if anything did happen, as this has happened, there would be no possible chance of being injured."

The three men who worked in this gang were Farmer, Baber and Rock. The only two living of this gang, Baber and Rock, testified that they were never given any instructions in the use and operation of the torch, until after the accident. Rock, however, further testified that he was not given any instructions, "because I was not the main man using it. I was assisting him." Mr. Moss testified that it was the duty of the foreman of the car department to give these men instructions; that Mr. Warren was the foreman of the car department, but these men were employed before Mr. Warren came to the company as an employee; that they were employed during the railway shopmen's strike in 1922, and did not know whether they were given instructions or not.

W. L. Moody, an expert analytical chemist, testified as to the effect of fuel oil as rubber. He said fuel oil is a petroleum product, being crude oil partially refined, and containing distillates such as gasoline, benzine, and petroleum spirits, known as light hydrocarbons, which have a solvent effect on rubber—

that is, tend to dissolve it. He produced in court the distillates in a separate tube, making plain which part of the oil had these injurious substances. He testified that, in his opinion, the effect was to make the rubber "swell up and lose its pep," make it lose its characteristics as rubber. He further testified as follows:

"Q. Here is a piece of hose which they offered in evidence. You can see at one end no rubber, and at the other end some rubber inside. Would that rubber be affected the way you said it would?

"A. There would be a tendency to solvent action on the rubber if it was exposed a long enough time to these light hydrocarbons.

"Q. About how long a time?

"A. I couldn't say; I don't know, because that would depend entirely on how much of those liquids the fuel oil carried. If it was highly refined, it would have practically none of those liquids there and been very little action. If it contained a good amount of those liquids, the action would be heavy. I couldn't say how long.

"Q. You wouldn't know how much petroleum, gasoline or kerosene was in a particular oil until you have examined it yourself?

"A. No, sir; not until I made a complete analysis of it.

"Q. But you state, as you understand it, fuel oil that is ordinarily sold on the market by companies like the Standard Oil Company and the like has that petroleum spirits and the like in it?

"A. Yes, sir; it contains all that.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   &   \*   \*

"Q. With the average fuel oil that is sold on the market would you be able to say whether the oil would act as a solvent on rubber, say, in three or four or five or six months?

"A. I should certainly think it would be some effect shown in three months."

The hose in question had been in use about five months when Farmer was killed.

Moody further testifies, in answer to the following questions:

"Q. * * * Now, as I understand, your evidence is that the action of the fuel oil on rubber hose tends to weaken it, and, therefore, would tend to make it more apt to burst?

"A. Make it pull out. That is reinforced hose you have there, and you have your canvas on top of the rubber. You have a rubber lining and canvas and probably another rubber and probably another canvas.

"Q. You say that tends to make it pull out? Is that a chemical or mechanical matter?

"A. If the light hydrocarbon gets to work on the rubber and dissolves it from around the nipple, it is common sense it is going to turn loose."

He further testified as follows:

"Q. This mechanical contrivance we are talking about has a collar that fits on the outside of the rubber. Now, can you see that the action of fuel oil has any effect as far as pulling that collar off the outside or pulling the rubber hose from the collar from the inside?

"A. Oh, not a bit; no, sir.

"Q. Assuming that the collar presses on the hose so that the collar itself can't pass over the nipple, the action of this fuel oil couldn't have any effect of making something to be done that is mechanically impossible, can it?

"A. I still say that whenever light hydrocarbons are in contact with rubber, which is the inner lining of your tube, there would tend to be a solvent action. The

rubber goes around the nipple on the inside of the tube, doesn't it? And the fuel oil runs up to the nipple and hits the nipple and dissolves the rubber all around the nipple; you have a space there to fill up with something. Then you get all the outside screws and nuts tightened up, but you have lost the rubber on the inside.

"Q. You don't think that would take place in five months, do you?

"A. No, sir.

"Q. Suppose a connection had just been made?

"A. If it was new hose it would be all right.

"Q. I am talking about a new connection. I understood your last answer to mean that where there was that connection allowed to remain a certain length of time, that the solvent action would have the effect such as you describe?

"A. Yes, sir.

"Q. That would not be true of a connection just made, would it?

"A. Not if the rubber was in good condition, because it takes time."

The end of the hose which was connected with the tank, and which blew off the nipple, was exhibited in court to the jury, and it, upon examination, showed that the inner rubber lining from the end, a distance of about an inch and a half, the length of the nipple, was missing. Baber testified that he examined this end of the hose after the accident, and that the inside rubber lining was missing. Rock testified that he examined the nipple on the tank and that some substance, apparently the rubber lining of the hose, was clinging to it. Both Baber and Rock testified that the remaining portion of the hose which they cut in two and refastened to the tank was apparently in good shape and fit for use.

The photographs exhibited to the jury showed that the hose carrying oil and the hose carrying air were about the same length and were side by side, from the tank to the torch, and they were placed on the torch at the same time. There was no evidence that the air hose was not in perfect condition.

Moss, a witness for the defendant, testified that if the connection with the tank was properly made it was practically impossible for the hose to be pulled off unless something very unusual happened; that he had known instances where, in moving cars in and about the yard, they hung up on the hose and dragged the torch as much as one or two car lengths without breaking the connection. He testified further that when he examined the hose which had blown off, he found that the connection had been improperly made; that the hose could not have been pushed up against the shoulder as the split ring or gripping device would have shown on the exterior of the hose how far it had been gripped, and in this particular instance it showed that it had been gripped only from three-sixteenth to ¼ of an inch. On the subject of the deterioration of the inner lining of the hose, he testified that when this deterioration set up particles of the hose would be blown into the nozzle causing it to splutter or to fail to operate at all, but when this was found to be true the old hose was discarded and a new one substituted; that they made no actual test of the inner lining of the hose because the depreciation would be shown in the manner indicated. He said that the hose would generally last from twelve to eighteen months, but owing to the acute pressure at the tank and sometimes at the nozzle that the hose was weaker at this point than along the line of hose; that the ends of the hose frequently became damaged from being dragged over the ground, and that when

the ends were found to be defective their practice was to cut off the defective ends and make new connections. He further testified that he had examined the piece of hose in use on the day of the accident, and it showed that the hose had not been put through the entire distance of the collar; that if it had been and had blown off, it would have destroyed the outside fibre of the hose; that if it had been put up to the shoulder the appliances in use would have gripped it the entire length, "but it never was up there." He had also examined carefully, after the accident, the automatic valve on the tank, and found it in perfect condition, and that the only way he could account for its failure to operate on the day of the accident was that some foreign substance must have gotten under it; that no amount of previous investigation would have prevented such an accident; that the valve might be in perfect condition when examined and a few minutes after fail to act on account of the foreign substance aforesaid. He further testified that Farmer was an experienced workman and first class mechanic and employed as a car man; that he was supposed to exercise some of his own ability in taking care of himself.

*S. S. P. Patteson* and *J. H. Rives, Jr.,* for the plaintiff in error.

*Leake, Leake & Spicer,* for the defendant in error.

Burks, J. (after making the foregoing statement), delivered the opinion of the court.

The learned judge of the trial court, in passing on the demurrer to the evidence, handed down the following memorandum opinion:

"I have given careful consideration to the case of *Farmer's Admx.* v. *Chesapeake and Ohio Railway Company*, pending before me on defendant's demurrer to the evidence, and after giving full application to the rules governing the manner in which the evidence should be viewed on a demurrer to it, my conclusions briefly stated are:

"1. The evidence does not disclose the business of the defendant, and the status of the car being repaired, sufficiently to enable the court to determine whether the deceased was, at the time of his death, in interstate employment; though this question would not, in my view, affect the liability of the defendant.

"2. It is not material to decide whether or in what manner the constitutional provision and section 5791 of the Code of Virginia affect the case.

"3. The object of an examination of the evidence is to ascertain whether an act or omission of the defendant was the proximate cause of the decedent's death. Giving the strongest probative effect to the evidence for the plaintiff, I think the most that can be said from all the evidence is, that it is equally probable that one of two causes produced decedent's death, viz., the condition of the rubber lining in the tube, or an improper new connection of the hose just before it was used. If the latter were the proximate cause, it was one for which the defendant was not liable. Under such circumstances, a recovery cannot be had. See such cases as *Honaker* v. *Whitley*, 124 Va. 194, 97 S. E. 808; *C. & O. Ry. Co.* v. *Whitlow*, 104 Va. 90, 51 S. E. 182; *Virginian Ry. Co.* v. *Andrews*, 118 Va. 482, 87 S. E. 577.

"This is a very appealing case. But as it seems to me fairly clear from the principles of law governing the case that the plaintiff has failed to establish the fact,

by a preponderance of the evidence, that the decedent's death was due to an act for which the defendant. was liable, I am constrained to hold that a case has not been made out for a judgment against the defendant.

"The demurrer to the evidence may, therefore, be sustained."

The primary question involved, and the most difficult one we have encountered, is, was the defendant guilty of negligence which proximately contributed to the death of the decedent? The plaintiff says that it was, and points out as acts of such negligence, (1) failure to inspect and keep in repair the rubber hose carrying fuel oil, (2) failure to keep in order the automatic valve, and (3) failure to instruct Farmer as to the safe way to operate the tank and torch.

We have been favored with a full argument and citation of authorities on the subject of proximate cause. It is a difficult subject, and one about which it is dangerous to generalize. We confine what we have to say to the facts of this case.

[1, 2, 3] In seeking the proximate cause of an injury, we must look to conditions as they were at the time of the injury, not to conditions as they might have been under different circumstances, nor to conditions as they ought to have been if every one had discharged the duties imposed upon him by law. Under the conditions existing at the time of the injury, the detachment of the hose from the tank set in motion the force which, in natural and continuous sequence, without any intervening cause, directly produced the injury complained of, and hence was the efficient or proximate cause thereof. The other causes referred to by the plaintiff were merely incidental. As said by Mr. Justice Strong, in *Aetna Ins. Co.* v. *Boon*, 95 U. S. 117,.

24 L. Ed. 395: "The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation. The causes that are merely incidental or instruments of a superior or controlling agency are not the proximate causes and the responsible ones, though they may be nearer in time to the result. It is only when the causes are independent of each other that the nearest is, of course, to be charged with the disaster." See also *Milwaukee R. Co.* v. *Kellogg*, 94 U. S. 24 L. Ed. 256; *Watts* v. *Southern Bell, &c. Co.*, 100 Va. 45, 40 S. E. 107; *Norfolk & W. R. Co.* v. *Whitehurst*, 125 Va. 260, 99 S. E. 568; 22 R. C. L., p. 110, and cases cited. The proximate or efficient cause remains the same, regardless of who set it in motion, though it must be determined from the evidence who set it in motion, and who is responsible for conditions existing at the time.

The plaintiff insists that the defendant was negligent in failing to inspect and keep in repair the rubber hose carrying fuel oil, and that the defective condition of the hose was the cause of its blowing off and becoming detached from the tank.

[4] As a general rule, it is the duty of the master to use ordinary care to furnish his servants with tools and utensils that are reasonably safe for the use to which they are to be applied. But he is not an insurer of the safety of the servant, and is liable for the consequences of negligence, not of danger. *Bertha Zinc Co.* v. *Martin*, 93 Va. 791, 22 S. E. 869, 70 L. R. A. 999. Such is the common law rule. How far, if at all, this rule is affected by constitutional or statutory provisions is to be discussed later.

[5] The general rule stated above is, however, subject to the exception that where the very work the servant is employed to do involves the construction or

repair of an instrumentality for the use of himself or others, and he knows or ought to know the dangers involved and of the proper method of construction or repair, the master is not liable for an injury to the servant resulting from his improper construction or repair. *Jacoby Co.* v. *Williams*, 110 Va. 55, 65 S. E. 491; *Dupont* v. *Hipp*, 123 Va. 49, 96 S. E. 280, and cases cited.

[6] Farmer's employment as car repairer involved the use of the torch. He was furnished a perfectly safe and sound hose in the first instance, but the ends were liable to be damaged in use by dragging the torch around in the yard, and it is manifest that he either knew or was instructed how to remedy the defect, for it is said in the petition for the writ of error:

"The defendant also had a general practice of cutting off the ends of the hose where the same was leaking close to a connection and using up the body of the hose. It is a fair inference to draw from this evidence that the decedent knew of this practice, and was merely putting into effect this practice of the defendant, in cutting off the leaky ends of the hose and reattaching the body of the hose to the tank and torch as he did. In making this connection and adjustment, he was doing exactly what the railroad's master mechanic would have done had the matter been called to his attention."

Where and how to cut the hose and make the new connection so as to render the torch safe for the use of himself and others, were matters he was employed to do.

Farmer was an experienced car repairer. He had had a year and a half experience before he was employed by the defendant; had been with the defendant in that capacity for eight or nine months, and during that

time had used this appliance at least ten or twelve times. He knew perfectly well, as soon as he tested the hose and found a leak, how to render it perfectly safe. The hose was sound and safe throughout its body, but was defective at the ends. It was necessary to cut off the defective ends back to the sound and safe part, and this he assumed to do without assistance or advice from the defendant, or anyone authorized to represent it. He either did the cutting himself, or was present directing and assisting in it. In this he exercised his own judgment and not the judgment or direction of the defendant. He undertook to render the hose safe for the use of himself and his fellow-workmen. This method of using the hose had been the defendant's mode of doing business in the past, was known to the decedent, and experience had shown it to be a safe method. If in the particular instance it proved to be unsafe, it was because Farmer did not cut off enough from the end, a matter about which he exercised his own judgment; and for which the defendant is not liable. The residue of the hose was examined shortly after the accident and was found to be in a sound and safe condition.

[7] Unless the injury complained of resulted from some defect, imperfection or other cause which would have been disclosed by proper inspection, the failure to inspect would not be actionable negligence. In the instant case, the main body of the hose was clearly shown to be in sound condition. Rock, a witness for the plaintiff, testified that "it had been used all right up until then, and if we cut out the bad part, it would be all right." When the air and oil were turned on before the torch was lighted, leaks were disclosed at each end of the oil hose where the pressure was most acute. The air and oil were then turned off, and the

oil hose disconnected at both ends, and Farmer and his assistants proceeded to make it safe, in the usual method adopted by the defendant, by cutting off the unsound ends. In this Farmer exercised his own judgment, and it is not clear that he was wrong, for the expert witness for the plaintiff, when shown the identical piece of hose involved in this case, testified that he could not tell by his eye whether it was defective or not, but that it would be necessary to "cut it open, rip off the rubber lining and take it to the laboratory and examine under a microscope." No such extraordinary and unusual tests to discover latent defects was required of the defendant. 18 R. C. L., pp. 562, 563. The defendant had a much simpler test. It was shown that as soon as a hose begins to deteriorate from the inside, the inner lining will flake off, and be blown into the needle valve of the torch and cause it to sputter or go out, and that when this occurs the hose is taken out of service and a new one provided. If, however, there was any fault or negligence in the manner of cutting off the ends of the hose, it was Farmer's, who either did the actual cutting off or took part in the operation.

[8] Rock, who was working with Farmer, and who testified for the plaintiff, says that just before the accident he suggested to Farmer getting a new hose from Mr. Moody, the foreman, but that Farmer did not act on the suggestion, and then he suggested to Moody that they ought to have a new hose, and that Moody replied that they might have some over at the roundhouse, and "we could go and get one." The suggestion, however, to Moody and his reply have no significance, because they were never communicated to Farmer, and were made while the torch was burning, and so immediately before the accident that they

could not have been acted on by Farmer even if he had been informed of them and desired to act on them. Hence, *C. & O. Ry. Co.* v. *Mizelle*, 136 Va. 237, 118 S. E. 241, has not the bearing on the instant case claimed for it.

[9] Under the circumstances hereinbefore stated, the condition of the hose and the failure to inspect it cannot be said to be a violation of the duty which the master owed to his servant. The use of the torch was within the line of the employment of Farmer, he was familiar with its use, was entrusted with so cutting off the ends of the hose as to make it safe for his own use, he was competent to make this necessary preparation, and if, in consequence of his own acts, injury and death have resulted to him, the defendant cannot be held liable.

It is not denied that it was the duty of Farmer to make the necessary connection between the hose and the tank. The completed torch, ready for use, was an instrumentality liable to change in the use. The ends of the hose, from acute pressure on the inside and from dragging on the ground on the outside, was liable to become damaged, necessitating cutting off. When this occurred it became the duty of Farmer, who was entrusted with the operation of the torch, to cut off the ends in such manner as to render safe the hose to be used in operating the torch. He was in far better position to know the needs of the occasion than the defendant could have been. He knew that the remedy was to cut off the defective ends back to the sound part of the hose, and this he undertook to do. He first tested the hose before lighting the torch, and, having discovered the leaks, he undertook to remedy the defects by cutting the hose at the proper places. If the failure to make a proper connection between the hose and the

tank was due to the defective condition of the hose at the point of connection, it was because Farmer had failed to cut off the hose as far back as he should have done, and this failure cannot be relied on as negligence of the company.

[10] There is much controversy over whether the connection of the hose with the tank was properly made. The two men who were working with Farmer, and who assisted in making the connections, testified that the connections were carefully made, and that the hose was carefully pushed up on the nipple to the shoulder thereof, that measurement was made of the length of the nipple and the corresponding distance was chalked on the hose, and that after the insertion of the nipple it could be felt in the hose at the point indicated by the chalk mark. The appliances for holding the hose on the nipple had to be put on the hose before the connection was made, and when they were put on and before the collar was tightened, the position of the hose could not be seen, and if, from any cause, the hose slipped back, it could not be discovered. The defendant proved that when the connection was properly made, the appliance clamped the hose so tightly that it would show the marks, or bite, of the appliance on the hose; that it could not be pulled off "unless something very unusual happens. We have instances where, in moving in and about the yard, they have hung up on the hose and dragged the torch as much as one or two car lengths without breaking the connection here when properly made;" and that if it should be pulled off, the outside texture of the hose would be abrased or puffed up so as to show the extent of the bite. These were physical facts, and no evidence was offered to controvert them. The piece of hose in controversy, at the point of connection, was cut off and

introduced in evidence in the trial court and exhibited in this court. It showed that the inside lining of the hose was gone for a distance of about one and one-half inches, and the evidence showed that the grip or bite of the appliance on the hose extended for only about one-fourth of an inch, instead of the distance it should have shown if the connection had been properly made, and there was no abrasure of the outside surface of the hose beyond this point. These physical facts show that the connection of the hose with the tank had not been properly made. The plaintiff insisted that the connection was properly made and that the failure of the appliances to hold it was due to the soft and rotten condition of the inner lining of the hose, or at all events that upon a demurrer to the evidence, in view of the positive evidence for the plaintiff that the connection was properly made, the demurrer should have been overruled and judgment entered for the plaintiff. We are unable to take this view. If the failure to grip the hose tightly was due to the condition of the inner lining of the hose, it was because Farmer failed to cut off the hose properly and leave a perfectly sound hose for use. If not due to that cause, the testimony for the plaintiff that the connection was properly made is contradicted by the undisputed physical facts.

[11, 12] The rule of decision upon a demurrer to the evidence is so familiar and has been so often stated in recent cases that it is not necessary to repeat it. But there are some features of the rule which seem sometimes to be lost sight of. The demurrant does not give up his parol evidence which is not in conflict with that of the demurree. He may supply gaps and fill in deficiencies in the evidence of the demurree, and show other independent affirmative facts, provided only they do not conflict, directly or indirectly, with

the evidence demurred to. Furthermore, in drawing inferences favorable to the demurree, the court can draw only such inferences as a jury might have *fairly* drawn from the evidence. The court is not bound to draw inferences that are strained, forced, or contrary to reason. *Parrish & Co.* v. *Pulley*, 126 Va. 319, 101 S. E. 236; *Bowers* v. *Bristol Gas Co.*, 100 Va. 533, 42 S. E. 297. Nor is the court called upon to believe the incredible. *Ches. O. R. Co.* v. *Anderson*, 93 Va. 650, 25 S. E. 947; *Va. & S. W. R. Co.* v. *Skinner*, 119 Va. 843, 89 S. E. 887.

[13] The failure of the defendant to inspect and keep in order the automatic valve is also assigned as negligence proximately contributing to the decedent's death. Noninspection can only impose liability where inspection would have prevented the injury. Inspection immediately after the accident, while it was in an unaltered condition, showed that the valve was in perfect order and it was proved that its failure to work at the time of the accident was probably due to some trash getting temporarily under it, and that it might be inspected at any time and "five minutes afterwards" a piece of trash might get under it and temporarily prevent its operation. It does not appear that inspection would have prevented the injury.

[14] It is alleged as negligence that the defendant failed to instruct Farmer as to the safe way to operate the tank and torch. No instruction is needed to a servant who knows and is capable of fully appreciating the danger to which he is exposed. Farmer was a skilled mechanic and had over two years' experience as a car repairer. He had been using this identical torch for eight or nine months—ten or twelve times at the least. He was familiar with its capacity for throwing a burning spray of oil twelve or fifteen feet, and knew as much

about the danger to which he was exposed as the master could tell him, and had been given safety first instructions by the master. What would probably not be observed by a child or an ignorant person would be apparent to him at a glance.

[15] As said in *DuPong* v. *Hipp*, 125 Va. 49, 55, 96 S. E. 280, 282; "The master is not under obligation to warn an adult servant of sound mind of the existence of dangers that are visible to men of ordinary intelligence, and has the right to assume, in the absence of evidence to the contrary, that his servant has ordinary intelligence and capacity and is possessed with the instinct of self preservation." See also *Jacoby Co.* v. *Williams, supra.* These remarks are particularly applicable to the case of a skilled mechanic, with years of experience, who has been injured by a piece of machinery which he has been employed to operate.

[16] Hitherto, we have followed the line of argument of the petition for the writ of error, and discussed the rights and liabilities of the parties at common law. The plaintiff in error, however, claims special and peculiar rights under section 162 of the Constitution. The provisions relied on are: "Knowledge by any such railroad employee injured of the defective or unsafe character or condition of any machinery, ways, appliances or structures, shall be no defense to an action for an injury caused thereby;" and "every employee of the railway company engaged in * . * any work in or upon a car or engine standing upon a track," etc. It is said in the petition for the writ of error: "The notice of motion stresses this section of the Constitution in so far as this employee was concerned, and is broader than section 5791 and section 5793 of Virginia Code 1919," and that the constitutional provision is self executing.

We concur with the trial court in saying: "It is not material to decide whether or in what manner the constitutional provision and section 5791 of the Code of Virginia affect the case, for our conclusion would be the same in either event.

The car upon which Farmer was working was only temporarily out of commission. It was standing on the light repair track for empty cars that did not require dismantling. The track was protected by a blue flag at each end thereof, the switches were locked and also provided with a derailer which also had a blue flag on it. The derailer throws any incoming engine or car from the rail to the ground, and "is supposed to be absolute protection for the workmen." Whether a car so placed is engaged in intrastate or any kind of commerce, it is not necessary to decide. *Ches. & O. Ry. Co.* v. *Mizelle*, 136 Va. 137, 118 S. E. 241.

[17, 18] The common law doctrine of assumption of risk was not totally abolished by section 162 of the Constitution. It was abolished only to the extent therein specified. In *Southern Ry. Co.* v. *Foster*, 111 Va. 763, 767, 69 S. E. 972, 974, which was a switching operation, it is said: "While the Constitution, section 162, and section 1294k of the Code do away with the common law doctrine of assumption of risk, so far as it applies to knowledge 'of the defective or unsafe character or condition of any machinery, ways, appliances or structures,' on the part of the servant of the railroad company, they do not change the common law rule of assumption of risk, as to the manner in which the master conducts his business. When the plaintiff's decedent entered into the service of the defendant company, he assumed all the ordinary and usual risks incident to the service (except those abolished by section 162 of the Constitution and section 1294k.

of the Code) including the risks incident to the manner in which he knew, or in the exercise of ordinary care ought to have known, the defendant conducted its business."

Possibly this general statement should be qualified to the extent of saying that it must appear, in some way, by experience or otherwise, that the master's method was a reasonably safe one. *Jeffress* v. *Va. Ry. & P. Co.*, 127 Va. 694, 104 S. E. 393. The application of this doctrine to the facts of the instant case would exclude it from the operation of section 162 of the Constitution.

[19] Nor does this constitutional provision apply to a servant employed for the purpose of rendering safe an unsafe appliance. If it did, it would practically prohibit the repair of such appliances. The provision was intended to meet the ordinary common law doctrine of assumption of risk in the cases specified, and not the extraordinary case of a skilled workman, with full knowledge of all the risks, undertaking to make safe a defective appliance. The instant case is within this exception. *Gay* v. *Southern R. Co.*, 101 Va. 466, 44 S. E. 707, also presents a state of facts which would exclude it from the operation of this provision of the Constitution.

[20] Section 1294k of the Code of 1904, as amended, was repealed by the Code of 1919. See revisors' note to section 5791 of the Code. In the reply brief it is said:

"It is true that the revisors' note to section 5791 of the Code refers to section 1294k as omitted and thereby repealed. Nevertheless, we respectfully, but most earnestly, insist that this statement that the law conferred rights on railroad employees in pursuance of section 162 of the State Constitution by which their

rights were enlarged, has never been repealed, and that the legislature cannot again restrict any rights which it has once enlarged under the power conferred by the Constitution. It was not clothed with power to restrict. After it put the employees in that class, it had and has no power to take them out of it. A careful reading of the note of the revisors shows that their purpose was to still further enlarge the class of employees therein provided for. Section 1294k as to the additional rights to persons in the named class became a part of section 162 of the State Constitution and could not be repealed or changed except by the methods providing for amending the Constitution itself."

[21] It has been too often said to need the citation of authority that the State Constitution is a restraining instrument only, and that, except so far as restrained by the State or Federal Constitution, the legislative powers of the General Assembly are unlimited. We see no reason why the general rule that the power to enact is a power to repeal does not apply to section 1294k. The provision of section 162 of the Constitution that "nothing contained in this section shall restrict the power of the General Assembly to further enlarge, for the above named class of employees, the rights and remedies hereinbefore provided for, or to extend such rights and remedies" was doubtless inserted, out of abundant caution, to negative the idea that any restraint in that respect was intended to be imposed upon the General Assembly. It did not otherwise affect its power. It did not, and could not, mean that a mere legislative enactment should be a constitutional provision.

Section 1294k was a mere legislative enactment, subject to repeal as other acts of Assembly. It was no part of the Constitution, and the legislature had no

power to make it so. If rights were conferred by it on railroad employees that did not exist prior to its enactment, those rights were taken away by its repeal in cases thereafter arising.

In the reply brief it is said: "Farmer's administratrix is not asking for the protection of any Federal law." Hence, we have made no reference to any such.

Upon the whole case, we are of opinion to affirm the judgment of the trial court.

*Affirmed.*